James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
   OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Samuel H. Rudman
Mario Alba Jr.
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARY CURRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>   vs.<br><br>FRESHPET, INC., RICHARD THOMPSON, RICHARD KASSAR, SCOTT MORRIS and CHARLES A. NORRIS,<br>             Defendants. | Civil Action No.<br><br><br><br>**COMPLAINT and<br><u>DEMAND FOR JURY TRIAL</u>** |

Plaintiff Gary Curran ("Plaintiff") makes the following allegations based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Freshpet, Inc. ("Freshpet" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of all purchasers of Freshpet common stock between April 1, 2015 and November 11, 2015, inclusive (the "Class Period"), seeking to pursue remedies under and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4.     Venue is properly laid in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).   The acts and conduct complained of herein occurred in substantial part in this District.

5.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of The NASDAQ Stock Market ("NASDAQ"), a national securities exchange.

## PARTIES

6.     Plaintiff Gary Curran is a citizen of Canada, residing in Guelf, Ontario.   Mr. Curran purchased Freshpet common stock, as set forth in the certification attached hereto and incorporated herein by reference, and was damaged thereby.

7.      Defendant Freshpet's principal place of business is located at 400 Plaza Drive, 1st Floor, Secaucus, New Jersey.  It manufactures and markets natural fresh foods, refrigerated meals, and treats for dogs and cats in the United States and Canada.

8.      Defendant Richard Thompson ("Thompson") is a resident of Center Valley, Pennsylvania.  He served, at all relevant times, as Chief Executive Officer and a Director of Freshpet.

9.      Defendant Richard Kassar ("Kassar") is a resident of New York, New York.  He served, at all relevant times, as Chief Financial Officer of Freshpet.

10.     Defendant Scott Morris ("Morris") is a resident of Chatham, New Jersey.  He is co-founder of Freshpet and has served as the Company's Chief Marketing Officer.  Defendant Morris is the Company's Chief Operating Officer.

11.     Defendant Charles A. Norris ("Norris") is a resident of Los Angeles, California. He is chairman of the Freshpet Board of Directors.  Defendant Norris is also the managing member of Freshpet Investors LLC, an entity which sold over two million shares in the Company's April 30, 2015 secondary offering.

12.     Defendants Thompson, Kassar, Morris and Norris are referred to herein as the "Individual Defendants."   Freshpet and the Individual Defendants are referred to herein, collectively, as "Defendants."

13.     During the Class Period, Defendants were privy to confidential and proprietary information concerning Freshpet, its operations, finances, financial condition and present and future business prospects.  Because of their positions with Freshpet, Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects *via* internal corporate documents, conversations and connections with other

corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and *via* reports and other information provided to them in connection therewith.  Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

14.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Freshpet's business.

15.     Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

16.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Freshpet's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially

misleading or untrue, so that the market price of Freshpet common stock would be based upon truthful and accurate information.  Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Freshpet common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Freshpet's business, operations, and the intrinsic value of Freshpet common stock; (ii) enabled certain Company insiders to sell more than $54 million of their personally-held stock to the public; and (iii) caused Plaintiff and other members of the Class to purchase Freshpet common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of himself and all purchasers, other than Defendants, of Freshpet common stock during the Class Period (the "Class").

19.     Excluded from the Class are Defendants herein, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

20.     The members of the Class are so numerous that joinder of all members is impracticable.  More than 33.51 million shares of Freshpet common stock were outstanding during the Class Period and actively traded during the Class Period.  The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.  In

addition, the names and addresses of the Class members can be ascertained from the books and records of Freshpet or its transfer agent.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

21.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

22.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

24.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      whether statements made by Defendants Freshpet, Thompson,  and Kassar during the Class Period were materially false and misleading;

(c)      whether the price of Freshpet common stock was artificially inflated during the Class Period; and

(d)      the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

25.      Defendant Freshpet is a manufacturer and marketer of natural fresh foods, refrigerated meals, and treats for dogs and cats in the United States and Canada.  Freshpet's products are sold to consumers through a network of Company-owned branded refrigerators, known as Freshpet Fridges, which are located in grocery stores and other retail outlets.

26.      The Company believes that its Freshpet Fridges give it a competitive advantage over other pet food for the following reasons: (i) it "replace[s] standard shelving in the pet aisle or an end-cap of a retail store"; (ii) it guarantees the Company "exclusive shelf space in the pet department of leading national retail chains"; (iii) it is a "brightly-lit and highly- visible merchandising platform" and allows the Company to control how the "brand is presented to consumers at the point of sale"; and (iv) retailers achieve an "average cash-on-cash payback period of less than 15 months" because "Freshpet grows sales of their overall pet category, drives higher traffic, increases shopper frequency and delivers category leading margins."

27.      The Company's growth strategy is thus linked exclusively with its ability to install new Freshpet Fridges in retail stores across North America.  At the beginning of the Class Period, the Company had installed its fridges in over 13,000 stores.

28.     The Class Period begins on April 1, 2015.  On March 31, 2015, after the close of the market, Freshpet issued a press release announcing its financial results for the fourth quarter and year end of 2014, the period ending December 31, 2014.  For the year, the Company reported net sales of $86.8 million, gross margin of 48.7%, and adjusted Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") of $5.5 million.  Defendant Thompson, commenting on the results, stated, in pertinent part, as follows:

> We are pleased to report strong top-line growth for Freshpet in our first quarter as a public company, driven by increased velocity and distribution across our retail channels.  We believe our solid results reflect our customers' growing desire to feed their pets fresh, natural food.  We are pleased with the improvements we achieved in fiscal 2014, which demonstrate our ability to successfully execute on our strategic initiatives to grow our company and create value for our shareholders. Going forward, we believe these improvements will assist us in reaching our expectations for 2015 and beyond.[1]

29.     With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> Outlook
>
> For full year 2015 the Company expects:
>
> • Net sales of $112.0 to $114.5 million, an increase of 29% to 32%, compared to 2014.
>
> • Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0 million compared to 2014.
>
> • Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%, compared to 2014.

30.     After the earnings announcement, Freshpet held a conference with analysts and investors to discuss the Company's earnings release and operations.  With regard to the Company's outlook for the first quarter and full year, Defendant Kassar, stated, in pertinent part:

---

[1]     Unless otherwise noted, internal citations are omitted and emphasis is added throughout.

We expect quarter-one Freshpet fridges of approximately 14,000, representing an increase of approximately 19.9%, and quarter-one net sales growth of approximately 37% to $26.5 million compared to quarter-one of 2014.  We expect adjusted EBITDA of approximately $2 million, an increase of approximately $1.2 million versus quarter-one of 2014.

As a reminder, quarter-four is historically when we have the lowest media spend.  For example, in quarter-one 2015, we spent approximately $3.3 million on media compared to quarter-four of 2014, when we spent approximately $50,000.  It is important to note that on an absolute basis, we do not expect to spend more on media in 2015 when compared to 2014.

For full-year 2015, we expect Freshpet fridges in the range of 15,100 to 15,600, representing an increase of approximately 13% to 17% compared to the prior year.  We project our net sales to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% versus 2014, and adjusted EBITDA to be in the range of $16 million to $17.5 million.

31.    In response to questions regarding the growth of its Freshpet Fridge locations,

Defendants Morris and Thompson stated, in pertinent part, as follows:

From a fridge standpoint, so we got off to a good start in the year, and we are looking for it to continue to develop at, I would say, a similar pace to how we saw the year develop last year.  What we want to make sure we are doing is we are guiding to really what we know versus what we think.  And you'll see that reflected in the fridge location guidance for the year, the [15.1 to 15.6] that we quoted.

\*      \*      \*

BILL CHAPELL: Got it.  And then -- and I appreciate the color.  As you look at kind of the cooler count for this year and the expansion, I imagine by now, you have pretty good visibility of where each cooler is going to go.  I mean, can you give us some more color there in terms of mass versus grocery or higher velocity versus lower velocity?  And also maybe any new customers you expect to see out of that mix next year?

RICHARD THOMPSON: Yes, Bill.  We've got -- we are very excited about where we are with our customers, and the momentum we have in all the areas, in new products, in sales, our velocity -- which, again, as I've said it before, but I'm very excited about the velocity, where we are headed here.

The store count is obviously growing.  But the main focus is obviously velocity, velocity, velocity.

But Scott, why don't you -- you can just talk about the stores, where they are going.

SCOTT MORRIS: Yes, sure.  So, I think, as we had anticipated the way it looks like it's going to come in this year, it will be heavier development in grocery and mass partners.  In addition, as you guys are well aware, we do have visibility out several months, but we also don't exactly know what's going to develop over the next kind of 30, 60 and 90 days.  And that's kind of why we gave a guidance where this is what we know versus what we think.

Now, over the 30 and 60, 90 days that we are going to kind of see, there could be some significant opportunities to come in, but we don't know those yet.  And we didn't want to put in our -- out a number that we may be incorrect on.

RICHARD THOMPSON: Yes.  And I just want to be very clear, Bill -- we are very confident, highly confident of our numbers this year for especially the velocity and the sales that we have this year.  So, the store count is important for sure, but the velocity is -- and sales are what our top priority are.

*So we are very confident that we are going to be where we need to be by the end of the year.  And we've got some new retailers that we are not in right now that we are having serious discussions with, that we are very excited about, that unfortunately, until we are actually in, I don't want to be able to use their names.  But we've got some new guys that we are not in right now that we are excited about getting into here shortly.*

32.  In reaction to these announcements, over the next six trading days, the price of Freshpet common stock rose from $19.43 per share on March 31, 2015, to $25.46 per share on April 9, 2015 – an increase of 31%.

33.  The statements referenced above in ¶¶28-31 were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)  that one of the Company's material customers, Target Corp., was undergoing a corporate reorganization and, accordingly, was delaying the installation of a significant number of Freshpet Fridges;

(b)  that two of the Company's supermarket customers were experiencing financial hardships such that it was likely that any Freshpet Fridges located in their respective stores would soon have to be removed; and

(c)      due to the foregoing, the Company was not growing its overall number of installed Freshpet Fridges at the levels communicated to investors and was tracking well below internal forecasts for such placements.

34.      Then, on April 27, 2015, Freshpet issued a press release announcing that it commenced a proposed public offering of 5,313,351 shares of its common stock held by Defendants Thompson, Morris, Norris and other Freshpet insiders.   In connection with the offering, Freshpet filed a registration statement, dated April 13, 2015, with the SEC (the "Registration Statement").   The Registration Statement failed to disclose the adverse facts detailed herein.

35.      On April 29, 2015, Freshpet issued a press release announcing the pricing of its public offering of 5,313,351 shares of its common stock at a public offering price of $21.47 per share.

36.      On May 7, 2015, Freshpet issued a press release announcing its financial results for the first quarter of 2015, the period ending March 31, 2015.   For the quarter, the Company reported net sales of $27.1 million, gross margin of 49.0%, adjusted EBITDA of $2.0 million, and Freshpet Fridges of 14,019.   Defendant Thompson, commenting on the results, stated, in pertinent part, as follows:

> We believe we are off to a great start in 2015 and our first quarter performance reflects strong sales velocity across each of our retail channels.  We are pleased to see this quarter's sales performance exceed our initial plans, due in part to a solid performance of our consumer marketing initiative.  Pet parents have continued to choose Freshpet's simple, natural foods to feed their pets, helping us grow significantly faster than the category.

37.      With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

Outlook

- 11 -

The Company reiterated its guidance for 2015.  For full year 2015, excluding any potential incremental impact associated with the Freshpet Baked test product, the Company expects the following full year results compared to prior year:

- Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.

- Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.

- Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%.

38.     After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  In response to questions concerning the Company's guidance of Freshpet Fridge store locations, Defendants Morris and Thompson, stated, in pertinent part:

ROBERT MOSKOW: Okay.  And then just to -- I wanted to check on -- there's a couple of major customers of yours that you thought might be dragging their feet a little bit in terms of getting new merchandising, and just being able to execute the way they normally execute.  Any changes in that timing or anything like that?  Or are they still in the throes of rethinking their broader strategies?  And is that still kind of slowing things down, I guess?

SCOTT MORRIS: I think the information that we can definitely share is that *we do feel consistently good about the range in stores that -- the guidance that we gave on the last call, the 15,100 to 15,600, and Dick just reiterated it*.  There are a handful of retailers that have had some challenging times this year.  There always are.  And we're waiting on a couple of reasonable sized opportunities that are pending for Q3, and I think that will -- depending on how those come through, it will put us at different places in the range.

ROBERT MOSKOW: Right.  Okay.  So, a couple of months ago, I think that's what you said, so there's no new news on that front in terms of that?

RICHARD THOMPSON: No, no.  But I can assure you, Rob, we keep working hard every day.  And every day, we make more and more contacts, and everybody loves what we're doing.

\*       \*       \*

MATTHEW LARSON: That's great to hear.  Well, we'll stay tuned.  Just one additional one.  Could you speak to what you're seeing as far as velocity gains across your footprints?  Any additional color by channel where you are seeing the strongest growth?

SCOTT MORRIS: Typically where we see the most significant increases in velocity are the channels that are outperforming the category.  So, you start at the top in pet specialty.  We typically get a little bit better performance; our stronger same-store sales growth.  Right under that you have mass, and then grocery.  And that's a very -- if you look at the growth rates across those channels, it's pretty similar.  What I mean by that is if you look at the growth rates in pet, those are going to be the highest; mass is going to be second; and grocery is going to be slightly lower.

So, outperforming in pet and mass; and mass and then grocery is kind of the last on the list.  And Whole Foods and natural is a clear outlier for us. We are seeing terrific numbers coming from them.

\*          \*          \*

BILL CHAPELL, ANALYST, SUNTRUST ROBINSON HUMPHREY: Any way to characterize the doors to date, the new coolers to date, between mass and specialty and what have you, just as we look on the velocity going forward for this year?

SCOTT MORRIS: To date, through Q1, about two-thirds of the stores -- yes, right around two-thirds of the stores in Q1 were mass.  And the vast majority of the rest of them were in grocery.   And we anticipate the mix shifting more towards grocery and mass throughout the back of the year.  Most of the time -- or basically what we're expecting to see is we'll see those numbers -- or the stores that we're adding -- being consistent with our average run rate across mass and grocery.  So we don't expect the mix of those stores to have any significant impact either way.

BILL CHAPELL: And just as I look at the door count and your guidance for this year, I would imagine with a six-, nine-month lead time for orders, do you have a pretty good idea of where we're going to fall out at this point?  How much upside potential can there be?

RICHARD THOMPSON: Bill, we're just going to stay with the guidance we've got, so that's where we're at.  ***We appreciate the question, but we're very confident will be at our guidance range***.

39.     The statements referenced in ¶¶36-38 were materially false and misleading for the

reasons set forth in ¶33 above.

40.     On August 11, 2015, Freshpet issued a press release announcing its financial

results for the second quarter of 2015, the period ending June 30, 2015.  For the quarter, the

Company reported net sales of $28.4 million, adjusted EBITDA of $2.8 million, and Freshpet

Fridges of 14,354.  Defendant Thompson, commenting on the results, stated, in pertinent part, as

follows:

> Our mission to provide simple, natural foods continues to resonate with pet
> parents and has propelled our strong performance in the first six months of 2015.
> In the second quarter, net sales increased approximately 39% reflecting improved
> sales velocity across each of our retail channels and enabled us to achieve
> increased adjusted EBITDA.  We continue to make strategic investments in
> increasing manufacturing capacity and in future sales growth to support the
> tremendous opportunities ahead of us.

41.    With regard to the Company's outlook, the press release stated, in pertinent part,

as follows:

> The Company reiterated its guidance for 2015.  For full year 2015, excluding any
> potential incremental impact associated with the expanded test of the Company's
> Freshpet Baked product, the Company expects the following full year results
> compared to prior year:

- Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.

- Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.

- Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately
  13% to 17%.

42.    After the earnings announcement, Freshpet held a conference call with analysts

and investors to discuss the earnings release and the Company's operations.  With regard to the

Company's outlook, Defendant Kassar, stated, in pertinent part:

> For the full year 2015, I'll reiterate our previously disclosed guidance.  We
> continue to expect Freshpet Fridges in the range of 15,100 to 15,600, representing
> an increase of approximately 13% to 17% compared to the prior year.  We project
> our net sales, excluding Freshpet Baked test product, to be in the range of $112
> million to $114.5 million, representing an increase of 29% to 32% compared to
> 2014.  And adjusted EBITDA, excluding Freshpet Baked test product, to be in the
> range of $16 million to $17.5 million, an increase of $10.5 million to $12 million
> compared to 2014.

43.    In response to this announcement, which revealed that the Company was

experiencing weaker gross margins and slowing fridge growth, on August 12, 2015, the price of

Freshpet common stock declined $0.87 per share, or 6%, to close at $13.73 per share, on heavy trading volume.  Defendants, however, continued to conceal the full scope of the problems impacting Freshpet's business and operations.

44.     The statements referenced above in ¶¶40-42 were materially false and misleading for the reasons stated above in ¶33.  In addition, the statements referenced above in ¶¶40-42 were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

        (a)     that the rise in beef prices had negatively impacted the Company's sales far worse than was disclosed; and

        (b)     that the Company was experiencing manufacturing and production issues that were delaying the introduction of certain new products.

45.     After the market closed on November 11, 2015, Freshpet issued a press release announcing its financial results for the third quarter of 2015, the period ending September 30, 2015.  For the quarter, the Company reported net sales of $30.6 million, adjusted EBITDA of $2.3 million, and Freshpet Fridges of 14,670.  The Company stated that the "decrease in gross profit margin was due to lower margin contribution from the Company's Freshpet Baked test product, which reduced third quarter 2015 gross margin by approximately 100 basis points.  In addition, manufacturing throughput constraints associated new product innovation as well as start-up costs from the implementation of new manufacturing processes further reduced gross margin by approximately 140 basis points."  Defendant Thompson, commenting on the results, stated, in pertinent part, as follows:

> In the third quarter, net sales increased 36%, driven by increased velocity per fridge, demonstrating continued consumer demand for Freshpet's simple, natural pet foods.  We made meaningful progress across several areas of our business, however, we experienced lower than expected Freshpet Fridge growth and our

gross margin was negatively affected by manufacturing inefficiencies from new product innovation and the near term cost of adjusting processes on our primary products.  As a result, we have updated our annual guidance to reflect these headwinds, and are intently focused on the execution of our operational and financial objectives. Going forward, we will further improve our manufacturing costs and processes, drive greater leverage across our business model and in turn, enhance long-term shareholder value.

46.     With regard to the Company's outlook, Defendants slightly upgraded their guidance for net sales and revised downward their guidance for adjusted EBITDA and Freshpet Fridges.  In that regard, the Company's outlook was revised as follows:

|  | Initial Guidance | Revised Guidance |
| --- | --- | --- |
| **Net sales** | $117.0 to $119.5 million | $115.5 million to $117.0 million |
| **Adjusted EBITDA** | $12.5 to $14.0 million | $10.0 million to $11.0 million |
| **Freshpet Fridges** | 15,100 to 15,600 | 14,900 to 15,000 |

47.     After the earnings announcement, the Company held a conference call with analysts and investors.  With regard to the Company's disappointing third quarter results and lowered guidance for the year, Defendant Thompson, stated, in pertinent part:

The third quarter sales increased approximately 36% to $30.6 million, driven by increased velocity growth per fridge.  Our sales growth continued to outpace the distribution growth of Freshpet Fridges which increased 13% year-over-year to 14,670 locations.  *As we previously communicated, we expect that our 2015 Freshpet Fridge location growth to be closer to the low-end of our full year guidance of 15,100 to 15,600*.

As we have gained more visibility, we now anticipate to end the year with approximately 15,000 Freshpet Fridges.  *We believe that the difference from our original guidance range to where we expect to end the year will be approximately $2.4 million in lost sales.  The recent bankruptcy of two grocery retailers has also impacted our fridge count and sales by approximately 100 locations*.

While we are of course disappointed that we must temper our expectations for bridge growth near-term, this does not deter our confidence in Freshpet long-term growth opportunities.  Time and time again we have seen the addition of a

Freshpet Fridge grow the overall pet category attract new consumers, increase shopping frequency and provide category leading retail margins.  This continues to be a strong value proposition for retailers and we still believe on average and over the next several years, the approximate 2,000 fridges on an annualized basis is achievable long-term.

As those familiar with our Company know, our Freshpet Fridge allows us to control critical real estate while truly differentiating our product at the point-of-purchase.  As we own and maintain them, our Freshpet Fridges are key barriers to entry.   This provides us with a unique Freshpet brand ambassador in every location.

The introduction of innovative new products in a diverse portfolio are important to driving sales growth and increased velocity.  Our innovation team and our developments this year have been tremendous, and we are very pleased with the consumer response to our new products.

However, production capabilities including the production throughput of our new Freshpet Shredded product has been lower than originally projected, and this limited our anticipated growth contribution and our gross profit margin was negatively impacted in the quarter by approximately 90 basis points.  I am pleased to say that our throughput rates improved a bit in October and early November, and we expect continued flow-through improvements once we begin to see the efficiencies from our upcoming manufacturing plant expansion, with a target completion date of second quarter 2016.

***Earlier this year we communicated our action to increase price on certain Freshpet beef products to help us better absorb the drastic increase in beef commodity cost.  As a result, we have experienced some softening in demand of those products.***

Those products represent approximately 20% of our business and we experienced a 15% reduction or about a $900,000 in sales for Q3, and a $1.5 million for the year-to-date periods.   We have since seen this trend level off with volume currently trending flat to up.

48.    With regard to the Company's gross margins and revised guidance, Defendant

Kassar stated, in pertinent part, as follows:

The following items impacted our gross margin performance in the quarter.

As Richard mentioned, our Freshpet Baked product currently has a gross margin of approximately 30%.  While we do expect this will improve to approximately 35% by the end of the year, this lowered our margin in quarter three by 103 basis points.

In addition, our Freshpet Shredded throughput out of our manufacturing facility, has been lower than our outlook originally projected it, and this resulted in 91 basis point drag to gross margin in the quarter. Finally, we also incurred a charge of $150,000 or 49 basis points from the implementation of new manufacturing processes in the quarter as we continuously look for efficiencies to improve our Freshpet roll production. In sum, these three items negatively impact our gross margin performance in the quarter by approximately 243 basis points.

\*       \*       \*

For the full-year 2015 we are updating our previous guidance. We now expect Freshpet Fridges in the range of 14,900 to 15,000, representing an increase of approximately 11.3% to [12.1%] compared to the prior year (company corrected after the call). As a result, net sales are to be in the range of $115.5 million to $117 million representing an increase of 33% to 35% compared to 2014. Our net sales guidance includes approximately $5 million from the Fresh Baked test product.

Adjusted EBITDA is expected to be in the range of $10 million to $11 million, an increase of $4.5 million to $5.5 million compared to 2015. Including the negative contribution of $3.8 million from the Freshpet Baked product. As a reminder, our adjusted EBITDA represents EBITDA plus loss on disposaled equipment, new plant startup expenses, share-based compensation, launch expense and secondary costs, and warrant expense.

49.     In reaction to these announcements, on November 12, 2015, the price of Freshpet common stock fell $2.09 per share, or 25%, to close at $6.28 per share, on heavy trading volume.

50.     The market for Freshpet common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged herein, Freshpet common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Freshpet common stock relying upon the integrity of the market price of Freshpet common stock and market information relating to Freshpet, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Freshpet common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as

- 18 -

set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Freshpet operations, acquisitions and future financial prospects.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Freshpet common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

## ADDITIONAL SCIENTER ALLEGATIONS

53.     For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants Freshpet, Thompson and Kassar.

54.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

receipt of information reflecting the true facts regarding Freshpet, their control over, and/or receipt and/or modification of Freshpet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Freshpet, participated in the fraudulent scheme alleged herein.

55.     Defendants were further motivated to engage in a fraudulent course of conduct in order to allow certain Company insiders and others to collectively sell over 6.1 million shares of their personally-held Freshpet common stock in the Company's secondary public offering for gross proceeds of over $131.1 million.  The chart below illustrates certain Company insider sales:

| Insider | Title | Date | Number Of Shares | Price | Proceeds |
|---------|-------|------|------------------|-------|----------|
| FRESHPET INVESTORS, L.L.C. | Beneficial Owner of More than 10% Class | May 5, 2015 | 2,490,170 | $20.34 | $50,650,058 |
| | | | | | |
| Farina (Thomas J) | Officer | May 5, 2015 | 15,000 | $20.34 | $305,100 |
| | | | | | |
| Hieger (Michael) | Officer | May 5, 2015 | 1,118 | $20.34 | $22,740 |
| | | | | | |
| Macchiaverna (Stephen) | Officer | May 5, 2015 | 10,050 | $20.34 | $204,417 |
| | | | | | |
| Morris (Scott James) | Officer | May 5, 2015 | 48,381 | $20.34 | $984,070 |
| Morris (Scott James) | Officer | May 5, 2015 | 3,874 | $20.34 | $78,797 |
| | | | 52,255 | | $1,062,867 |
| | | | | | |
| Thompson (Richard C) | Chief Executive Officer | May 5, 2015 | 15,828 | $20.34 | $321,942 |
| Thompson (Richard C) | Chief Executive Officer | May 5, 2015 | 34,980 | $20.34 | $711,493 |
| | | | 50,808 | | $1,033,435 |

| Insider | Title | Date | Number Of Shares | Price | Proceeds |
|---------|-------|------|------------------|-------|----------|
| | | | | | |
| Walsh (Cathal) | Officer | May-5, 2015 | 36,195 | $20.34 | $736,206 |
| | | | | | |
| | | Total: | 2,655,596 | | $54,014,823 |

## LOSS CAUSATION

56.    For the purposes of this section of the Complaint, the term "Defendants" refers only to Defendants Freshpet, Thompson, and Kassar.

57.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Freshpet common stock and operated as a fraud or deceit on Class Period purchasers of Freshpet common stock by failing to disclose and misrepresenting the adverse facts detailed herein.    As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Freshpet common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

58.    As a result of their purchases of Freshpet common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.   Defendants' false and misleading statements had the intended effect and caused Freshpet common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $25.46 per share on April 9, 2015.

59.    By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Freshpet's business, products and operations.   When the truth about the Company was revealed to the market, the price of Freshpet common stock fell significantly.   These declines removed the inflation from the price of Freshpet common stock,

causing real economic loss to investors who had purchased Freshpet common stock during the Class Period.

60.    The declines in the price of Freshpet common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Freshpet common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

61.    The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Freshpet common stock and the subsequent significant decline in the value of Freshpet common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

<div align="center">

**Applicability of Presumption of Reliance:
<u>Fraud on the Market Doctrine</u>**

</div>

62.    At all relevant times, the market for Freshpet common stock was an efficient market for the following reasons, among others:

(a)    Freshpet common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    as a regulated issuer, Freshpet filed periodic public reports with the SEC and the NASDAQ;

(c)    Freshpet regularly communicated with public investors *via* established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

<div align="center">

- 22 -

</div>

(d)    Freshpet was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

63.    As a result of the foregoing, the market for Freshpet common stock promptly digested current information regarding Freshpet from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers of Freshpet common stock during the Class Period suffered similar injury through their purchase of Freshpet common stock at artificially inflated prices and a presumption of reliance applies.

<u>COUNT I</u>
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against Defendants Freshpet, Thompson, and Kassar**

64.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

66.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

67.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Freshpet common stock.  Plaintiff and the Class would not have purchased Freshpet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

68.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freshpet common stock during the Class Period.

<div align="center">

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against Defendants Thompson and Kassar**

</div>

69.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70.     Defendants Thompson and Kassar acted as controlling persons of Freshpet within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of Freshpet, and their ownership of Freshpet stock, Defendants Thompson and Kassar had the power and authority to cause Freshpet to engage in the wrongful conduct complained of herein.

71.     By reason of such conduct, Defendants Thompson and Kassar are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, the Plaintiff, on behalf of himself and the Class, pray for judgment as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other relief as the Court deems just and proper.

<div style="margin-left:40%;">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:___/s/ James E. Cecchi_____
        JAMES E. CECCHI

</div>

DATED:  April 21, 2016

Samuel H. Rudman
Mario Alba Jr.
ROBBINS GELLER RUDMAN
   & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Frank J. Johnson
JOHNSON & WEAVER, LLP
600 West Broadway, Suite 1540
San Diego, CA 92101
(619) 230-0063

Michael I. Fistel, Jr.
JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, Georgia 30064
(770) 200-3104

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

<div style="margin-left:50%">

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff


By:    /s/ James E. Cecchi
        JAMES E. CECCHI

</div>

DATED:  April 21, 2016

Samuel H. Rudman
Mario Alba Jr.
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY  11747
(631) 367-7100

Frank J. Johnson
JOHNSON & WEAVER, LLP
600 West Broadway, Suite 1540
San Diego, CA 92101
(619) 230-0063

Michael I. Fistel, Jr.
JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, Georgia 30064
(770) 200-3104

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Gary Curran, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint and authorize its filing.

2.      I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| April 17, 2015 | 50 | $23.92 |
| | | |
| | | |
| | | |
| | | |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| November 12, 2015 | 50 | $5.92 |
| | | |
| | | |
| | | |
| | | |

DocuSign Envelope ID: E24C4F20-C309-4EBD-8BB5-7C597049F264

5.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 15th day of April 2016.

DocuSigned by:

*Gary Curran*

Gary Curran