James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
(973) 994-1700

Liaison Counsel for Lead Plaintiff

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

Lead Counsel for Lead Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| GARY CURRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>FRESHPET, INC., RICHARD THOMPSON, RICHARD KASSAR, SCOTT MORRIS and CHARLES A. NORRIS,<br><br>Defendants. | No. 2:16-cv-02263-MCA-LDW<br><br>AMENDED COMPLAINT |

Lead Plaintiff Alaska Electrical Pension Fund ("Lead Plaintiff") makes the following allegations based upon the investigation of Lead Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Freshpet, Inc. ("Freshpet" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports and other public statements issued by or about the Company, and interviews with former Freshpet employees. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of purchasers of the common stock of Freshpet between April 1, 2015 and November 11, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act") and the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §§77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4. Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

5. In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications, and the facilities of the NASDAQ Global Market ("NASDAQ"), a national securities exchange.

**PARTIES**

6. Lead Plaintiff Alaska Electrical Pension Fund, as set forth in the certification previously filed with the Court and incorporated herein by reference, purchased shares of Freshpet common stock in the Secondary Offering, as defined herein, and on the open market, and was damaged thereby.

7. Defendant Freshpet manufactures and markets natural fresh foods, refrigerated meals, and treats for dogs and cats in the United States and Canada. Freshpet stock is listed and trades on the NASDAQ under the ticker symbol "FRPT."

8. Defendant Richard Thompson ("Thompson") served as Chief Executive Officer ("CEO") of Freshpet from January 2011 to July 2016, and as a member of Freshpet's Board of Directors from December 2010 to July 2016. Defendant Thompson signed the Registration Statement, as defined herein, issued in connection with the Secondary Offering.

9. Defendant Richard "Dick" Kassar ("Kassar") served as Chief Financial Officer ("CFO") of Freshpet since January 2011. Defendant Kassar previously served as Freshpet's CEO from July 2006 to January 2011 and President from January 2011 to June 2014. Defendant Kassar signed the Registration Statement.

10. Defendant Scott Morris ("Morris") is a co-founder of Freshpet and has served as the Company's Chief Operating Officer ("COO") since July 2015. Defendant Morris served as the Company's Chief Marketing Officer ("CMO") from January 2014 to July 2015.

11. Defendant Charles A. Norris ("Norris") has been a member of Freshpet's Board of Directors and Chairman of the Board since October 2006. Defendant Norris is also a managing member of Freshpet Investors LLC, an investment management firm and a Principal Stockholder of Freshpet. Freshpet Investors LLC's other managing member is Kayne Anderson Capital Advisors L.P. Prior to the Secondary Offering, Freshpet Investors LLC owned 18.8% of outstanding Freshpet common stock. Freshpet Investors LLC sold approximately 2.5 million of shares in the Secondary Offering thereby reducing its holdings to 11.4% of outstanding Freshpet common stock.[1] Defendant Norris signed the Registration Statement issued in connection with the Secondary Offering.

12. Defendants Thompson, Kassar, Morris, and Norris are referred to herein as the "Individual Defendants." Freshpet and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

13. Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons who purchased Freshpet common stock during the Class Period and were damaged thereby (the "Class").

---

[1] MidOcean Associates SPC ("MidOcean"), a private equity firm, is also a Principal Stockholder of Freshpet. Prior to the Secondary Offering, MidOcean owned 26% of outstanding Freshpet common stock. MidOcean sold 1.75 million of shares in the Secondary Offering thereby reducing its holdings to 20.7% of outstanding Freshpet common stock.

14. Excluded from the Class are Defendants, members of the immediate families of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

15. The members of the Class are so numerous that joinder of all members is impracticable. More than 33.51 million shares of Freshpet common stock were outstanding and actively traded during the Class Period. The precise number of Class members is unknown to Lead Plaintiff at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Freshpet or its transfer agent. Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

16. Lead Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

17. Lead Plaintiff's claims are typical of the claims of the other members of the Class because Lead Plaintiff's and Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Lead Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

18. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may

be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to seek redress for the wrongful conduct alleged. Lead Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

19. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants during the Class Period were materially false and misleading;

(c) whether the price of Freshpet common stock was artificially inflated during the Class Period; and

(d) the extent of injuries sustained by the members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

20. Defendant Freshpet went public in November 2014.

21. The Company is a manufacturer and marketer of natural fresh foods, refrigerated meals, and treats for dogs and cats. Unlike traditional pet food, Freshpet's products are sold to consumers in the United States and Canada through a network of Company-owned branded refrigerators, known as "Freshpet Fridges" ("Fridges"), which are located in grocery stores and other retail outlets.

22. The Company describes its corporate culture as "disrupting the North American pet food industry, which is an over $22 billion industry, by driving consumers to reassess conventional dog and cat food offerings that have remained essentially unchanged for decades. We position our brand to benefit from mainstream trends of growing pet humanization and consumer focus on health and wellness." In other words, as people are increasingly watching what they eat and choosing organic and natural foods, Freshpet expects that this trend will extend to their pets.

23. According to the Company, its Freshpet Fridges give it a competitive advantage over other pet food for the following reasons: (i) they "replace standard shelving in the pet aisle or an end-cap of a retail store"; (ii) they guarantee the Company "exclusive shelf space in the pet department of leading national retail chains"; (iii) they provide a "brightly-lit and highly-visible merchandising platform" and allow the Company to control how the "brand is presented to consumers at the point of sale"; and (iv) retailers achieve an "average cash-on-cash payback period of less than 15 months" because "Freshpet grows sales of their overall pet category, drives higher traffic, increases shopper frequency and delivers category leading margins."

24. Accordingly, the Company's growth strategy is directly linked with its ability to install new Freshpet Fridges in retail stores across North America and to launch new products. By March 31, 2015, Freshpet reported that it had 14,019 Fridges installed in stores.

**The Secondary Offering**

25. On April 13, 2015, Freshpet filed a Form S-1 registration statement with the SEC for the sale of 4,500,000 shares of Freshpet common stock held by Freshpet insiders. Thereafter, in response to comments from the SEC, Freshpet filed amended versions of the registration statement.

26. On April 30, 2015, Freshpet filed a prospectus (the "Prospectus") with the SEC, which forms part of the registration statement (collectively referred to as the "Registration Statement").

27. On May 5, 2015, the Registration Statement was declared effective and Freshpet sold 6,110,353 shares of common stock to the public at a price of $21.47 per share, thereby generating gross proceeds of $131 million (the "Secondary Offering"). Freshpet did not receive any proceeds from the Secondary Offering. The following chart reflects sales made by Freshpet's two Principal Stockholders and its executive officers and directors:

| Seller | Position | Number of Shares | Proceeds |
|---|---|---|---|
| Freshpet Investors LLC | Beneficial Owner of More than 10% Class | 2,490,170 | $50,650,058 |
| MidOcean Associates SPC | Beneficial Owner of More than 10% Class | 1,750,000 | $35,595,000 |
| Morris (Scott James) | Chief Marketing Officer | 52,255 | $1,062,867 |
| Thompson (Richard C.) | Chief Executive Officer | 50,808 | $1,033,435 |
| Kassar (Richard) | Chief Financial Officer | 30,300 | $616,302 |
| Walsh (Cathal) | Officer | 36,195 | $736,206 |
| Farina (Thomas J.) | Officer | 15,000 | $305,100 |
| Macchiaverna (Stephen) | Officer | 10,050 | $204,417 |
| Hieger (Michael) | Officer | 1,118 | $22,740 |
| **Total:** | | **4,435,896** | **$90,226,125** |

**The Registration Statement Contained Inaccurate Statements of Material Fact and Omitted Material Information Required to Be Disclosed Therein**

28. The Registration Statement was negligently prepared and, as a result, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations

governing its preparation. First, the Registration Statement negligently failed to identify and disclose known trends, events, demands, commitments and uncertainties that were then having and were reasonably likely to have a material effect on Freshpet's operating performance. Second, the Registration Statement contained inaccurate statements of material fact concerning Freshpet's relationship with certain of its largest customers.

29. Item 11 of Form S-1 required the Registration Statement to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303], *Management's Discussion and Analysis of Financial Condition and Results of Operations* ("MD&A"). As set forth in the December 29, 2003 interpretative release to Item 303 of Regulation S-K issued by the SEC (the "2003 Interpretive Release"), the purpose of MD&A is to provide investors with information necessary to an understanding of a company's results of operations, including the identification and disclosure of known trends, events, demands, commitments and uncertainties that are reasonably likely to have a material effect on a company's operating performance.

30. The instructions to Item 303(a) of Regulation S-K required that the Registration Statement provide disclosure about and "focus specifically" on material events and uncertainties that would cause Freshpet's reported financial information not to be necessarily indicative of future operating results, including "matters that would have an impact on future operations and [matters that] have not had an impact in the past" stating, in pertinent part, as follows:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. This would include descriptions and amounts of (A) matters that would have an impact on future operations and have not had an impact in the past, and (B) matters that have had an impact on reported operations and are not expected to have an impact upon future operations.

31. The 2003 Interpretive Release also provides that the Registration Statement was required to provide disclosure about known demands, events or uncertainties, except for those that management determined: (i) were not reasonably likely to occur; or (ii) would not have a material effect on Freshpet's operating results. The 2003 Interpretive Release states, in pertinent part, as follows:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty is required unless a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

32. **Sales and Fridge Placement Problems at Largest Customers**: At the time of the Secondary Offering, Freshpet was experiencing a host of issues with its largest customers which were then negatively impacting the Company's operations and were likely to continue doing so. The Registration Statement was required to disclose these facts but did not.

33. **Petco Animal Supplies Inc. ("Petco") and PetSmart Inc. ("PetSmart")**: At the time of the Secondary Offering, Freshpet's Fridge growth was stagnating in two of the Company's largest retail locations, Petco and PetSmart, and the Company was failing to meet its internal sales or Fridge placement expectations.

34. Petco and PetSmart are specialty retailers of pet food and pet-related products. According to the Registration Statement, these retailers were the second- and third-largest locations, respectively, for Freshpet Fridges. Both companies are privately held and therefore do not publicly report their financial results. Petco was taken private in 2006 and PetSmart was taken private in March 2015.

35. At the time of the Secondary Offering, Petco and PetSmart were experiencing declining growth rates in the number of Freshpet Fridges they were willing to install in their

stores and were experiencing declining sales of Freshpet products. Petco and PetSmart were experiencing intense competition from online sellers of pet food, which translated into declining numbers of consumers visiting Petco and PetSmart, and as a result, Freshpet was not growing its installed Fridge base as fast as expected in those stores. Moreover, as Petco and PetSmart faced increased online competition, they were grappling with whether to embrace Freshpet's model of premium, fresh pet food as opposed to focusing back on basic brands of pet food.

36. Petco's and PetSmart's troubles extended beyond Freshpet at the time of the Secondary Offering. Other brands in Petco and PetSmart were also struggling due to competition from online pet-food retailers, and Petco and PetSmart were looking for more investments from their manufacturers. Thus, at a time when Freshpet was looking to Petco and PetSmart to take on additional Fridges and sell more of the Company's products, Petco and PetSmart were, conversely, seeking greater investment from Freshpet.

37. Separately, at the time of the Secondary Offering, PetSmart harbored concerns about the shelf life of Freshpet's products, and PetSmart was unwilling to expand its line of Freshpet products by a significant amount because of its potential exposure to losses from expired products. Indeed, after PetSmart was acquired by private-equity firm BC Partners in March 2015, new PetSmart management wanted to expand its Freshpet offerings but declined due to potential losses with expired Freshpet products.

38. At the time of the Secondary Offering, Defendants knew of the adverse issues with Petco and PetSmart as detailed herein, which were then having a materially adverse effect on the Company's continuing operations and would continue to do so.

39. **Target Corp. ("Target")**: At the time of the Secondary Offering, Target, the Company's fourth-largest location for Freshpet Fridges, was undergoing a corporate

reorganization and, therefore, was likely to postpone the installation of a significant number of Freshpet Fridges. In addition, in January 2015, Target's Canadian operations filed for bankruptcy protection and closed all 133 of its Canadian stores by April 2015, further diminishing the Company's prospects for Fridge growth.

40. On March 3, 2015, Target announced that it was embarking on a corporate reorganization that would eliminate several thousand positions over the next two years and result in cost savings of $2 billion over that time period. In a press release, Target explained that those savings would be realized through operations, technology and process improvements; supply chain and sourcing efficiencies; and corporate restructuring. Target said the restructuring would be concentrated at its headquarters locations and focus on driving leaner, more efficient capabilities, removing complexity, and allowing the organization to move with greater speed and agility. Target also said it would prioritize the Style, Baby, Kids, and Wellness merchandise categories. According to Target, other categories, including Grocery, were being repositioned to deliver a more compelling and appealing shopping experience. Target made no mention of prioritizing the Pet category, which had previously been a key merchandising category. A week later, on March 10, 2015, Target terminated approximately 1,700 employees as part of the reorganization.

41. In addition, Target's doomed foray into Canada had a major impact on Freshpet. During 2013 and 2014, Target rapidly opened 133 stores in Canada (it previously had zero stores outside of the United States). However, Target's Canadian stores suffered a number of systemic problems, and on January 15, 2015, Target announced that it planned to discontinue all operations in Canada and that Target Canada had filed for bankruptcy. By April 2015, Target closed all 133 of its Canadian stores. Yet the Company had Fridges in many of Target's

Canadian stores and had been forecasting growth there. The Registration Statement should have disclosed the impact that Target's Canadian bankruptcy was having and would have on the Company's continuing operations.

42. At the time of the Secondary Offering, Defendants knew of the adverse issues with Target as detailed herein, which were then having a materially adverse effect on the Company's continuing operations and would continue to do so.

43. **Manufacturing and Production Problems with Shredded Dog Food Product**: Freshpet's new "shredded" dog food product was experiencing manufacturing and production problems that were significantly limiting sales of the product and causing relationship issues with some of the Company's largest customers, which were negatively impacting the Company's ability to grow business with those customers.

44. In 2014, Freshpet introduced its shredded dog food product. By the time of the Secondary Offering, Freshpet's shredded dog food product was the best seller in many of its Fridges.

45. At the time of the Secondary Offering, however, Freshpet was experiencing significant manufacturing throughput constraints with its shredded product. Throughput is the amount of material or items passing through a system or process. A throughput constraint is where a manufacturer cannot meet demand because its throughput is smaller than expectations.

46. Freshpet's shredded dog food product required a different manufacturing process than that employed for the Company's other products, yet the Company was using production equipment that wasn't designed to manufacture shredded product. As a result, Freshpet was having to replace manufacturing equipment at a faster rate than anticipated. For example, Freshpet experienced throughput constraints with its rotators, a machine that Freshpet forced to

produce the shredded product even though it was not designed to do so. Because Freshpet had to figure out a number of other solutions in terms of how the shredded product actually went into the steam cooker, Freshpet did not achieve the level of throughput it had expected.

47. Throughput constraints with respect to the shredded product existed by the beginning of 2015. Freshpet launched the product in July 2014 but could not meet the original timing of distribution to some of its customers. Freshpet improved its distribution by October 2014, and by 2015, Freshpet realized just what an amazing product shredded was. Consequently, the Company kept trying to retool the manufacturing of its existing line versus the new shredded line. In the past, Freshpet had sufficient time to reengineer its processes and products because of the ample time in production. However, with the additional new products that Freshpet was producing, the Company's main production facility in Bethlehem, Pennsylvania was stretched to maximum capacity. Freshpet had no additional time to devote to reengineering the product, and that was a major constraint to Freshpet's overall profitability. As a result, the machines making the shredded product were consistently breaking down from the beginning of 2015 through the rest of that year.

48. Freshpet's throughput problems created several material problems for the Company that were negatively impacting its continuing operations. First, as a result of the throughput issues, Freshpet was unable to produce enough product for its most important customers, resulting in significant distribution delays, and this inability was causing customer dissatisfaction and reduced sales. For example, at the time of the Secondary Offering, Freshpet was experiencing difficulty in keeping its Fridges stocked in Walmart, its largest retailer of Freshpet Fridges. It was Walmart's policy to fine companies that were unable to keep their products sufficiently stocked. In the first half of 2015, Freshpet had its Fridges in approximately

thirty percent of Walmart's U.S. stores. Freshpet management had hoped to expand into more Walmart locations, but the fact that Freshpet was on the verge of being fined for not being able to keep its Fridges stocked significantly hurt its chances for growth at Walmart. Second, the throughput issues, which existed at the time of the Secondary Offering, negatively impacted Freshpet's gross profit margin for the third quarter of 2015. Specifically, on November 11, 2015, Freshpet disclosed that the manufacturing throughput problems for its shredded product resulted in a 91 basis-point impact on gross profit margin in 3Q15 and was a primary driver of the Company's lower-than-expected Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA") guidance for the following quarter.

49. At the time of the Secondary Offering, Defendants knew of the adverse issues with Freshpet's shredded product as detailed herein, which were then having a materially adverse effect on the Company's continuing operations and would continue to do so.

50. **Inaccurate Statements of Material Fact**: The Registration Statement contained inaccurate statements of material fact concerning Freshpet's relationship with certain of its largest customers.

51. The Registration Statement discussed in positive terms the Company's expansion of its network of Fridges with Petco, PetSmart, and Target, stating, in pertinent part, as follows:[2]

> ***We have successfully expanded our network of Freshpet Fridges within leading blue-chip retail chains including*** Albertsons, BJ's, Kroger, ***Petco, PetSmart,*** Publix, Safeway, ***Target,*** Wal-Mart and Whole Foods. The strength of our business model extends to our customers, who we believe find that Freshpet grows their pet category sales, drives higher traffic, increases shopper frequency and delivers category leading margins. As of December 31, 2014, Freshpet Fridges were located in over 13,300 stores, and ***we believe there is an opportunity to install a Freshpet Fridge in at least 35,000 stores across North America***.

---

[2] Unless otherwise noted, emphasis is added throughout.

* * *

> **Proven, scalable and defensible point-of-sale retail model**. We sell our products through a fast-growing network of company-owned branded refrigerators, or Freshpet Fridges, which replace standard shelving in the pet aisle or an end-cap of a retail store. We are the only company to have a branded refrigeration fixture, in-aisle electric power and significant exclusive shelf space in the pet department of leading national retail chains. We believe our Freshpet Fridges generate compelling economics with an average cash-on-cash payback period of less than 15 months, calculated by comparing our total current costs for a refrigerator (including installation and maintenance) to our current margin on net revenues. We have installed Freshpet Fridges across all major classes of pet retail including grocery, mass, club, pet specialty and natural. ***Our track record of consistently growing the number of store locations with key customers underscores the success of our point-of-sale model***.

| Selected Customers | Year Entered | Freshpet Fridge Locations at Launch | Freshpet Fridge Locations at December 31, 2014 |
|---|---|---|---|
| Wal-Mart | 2007 | 51 | 1,639 |
| ***Petco*** | ***2007*** | ***97*** | ***1,374*** |
| ***PetSmart*** | ***2006*** | ***29*** | ***1,328*** |
| ***Target*** | ***2012*** | ***50*** | ***1,178*** |
| Kroger | 2007 | 185 | 970 |
| Whole Foods | 2012 | 29 | 242 |

52. The Registration Statement also explained that the Company planned to install more than 6,000 Fridges in new retail locations over the next three years, stating, in pertinent part, as follows:

> **Continue to grow points of distribution by installing new Freshpet Fridges**. ***We believe there is a significant opportunity to continue to grow our network of Freshpet Fridges by expanding within the store base of existing and new customers***. We grew the number of Freshpet Fridge store locations at a compounded annual rate of 24% between 2011 and 2014. We operate Freshpet Fridges in more than 13,300 stores, and we estimate that there is an opportunity to install a Freshpet Fridge in at least 35,000 retail locations across North America. ***Over the next three years, we plan to install over 6,000 Freshpet Fridges in new retail locations***. We expect continued demand for our Freshpet Fridges driven by the strong business proposition and attractive margins that we deliver to customers.

53. The Registration Statement discussed the Company's plan to continue to enhance its operating margins through, among other things, the investments it made in manufacturing capacity. The Company stated, in pertinent part, as follows:

> **Continue to enhance our operating margins**. We intend to enhance our operating margins, which we define as net sales minus costs of goods sold minus selling, general & administrative expenses divided by net sales, through efficiencies of scale as we grow our net sales ahead of costs. ***We have made significant investments in management, manufacturing capacity, information systems and other infrastructure to enable us to pursue our growth***. From 2011 through 2014, we expanded our gross profit margins by approximately 610 basis points from 42.6% to 48.7%. We expect that gross profit margins improvement and operating leverage from SG&A costs will be a significant driver of earnings growth going forward.

54. The statements referenced above in ¶¶51-53 were inaccurate statements of material fact because they failed to disclose the following adverse facts which existed at the time of the Secondary Offering:

(a) that the Company was then experiencing manufacturing and production problems that were affecting Freshpet's production of its shredded product;

(b) that the growth of Freshpet Fridges was stagnating in Petco and PetSmart, and the Company was not growing the number of Fridges in those retailers as fast as expected;

(c) that Target's bankruptcy filing for its Canadian operations was having, and would have, a material impact on Freshpet Fridge growth and dog food sales at those locations; and

(d) that Target was undergoing a corporate reorganization such that it was likely to postpone the installation of a significant number of Freshpet Fridges.

55. **Misleading Risk Disclosures**: The risk disclosures in the Registration Statement negligently failed to advise investors about significant, then-existing (as opposed to potential) factors that made the Secondary Offering speculative or risky.

56. The Registration Statement inaccurately described the ***potential*** risks associated with manufacturing throughput constraints. The Registration Statement stated, in pertinent part, as follows:

> If our growth exceeds our expectations, we ***may not*** be able to increase our own manufacturing capacity to, or obtain contract manufacturing capacity at, a level that meets demand for our products, which could prevent us from meeting increased customer demand and harm our business. However, if we overestimate our demand and overbuild our capacity, we may have significantly underutilized assets, and we may experience reduced margins. If we do not accurately align our manufacturing capabilities with demand, it ***could have*** a material adverse effect on our business, financial condition and results of operations.

57. The statement above was an inaccurate statement of material fact because it negligently failed to disclose the significant then-existing, as opposed to potential, risks associated with Freshpet's manufacturing throughput constraints associated with the shredded product. As noted above, Freshpet suffered manufacturing delays on the shredded product at the time of the Secondary Offering, which, in turn, prevented the Company from producing enough product for its most important customers and negatively impacted Freshpet's gross profit margin and its relationships with several important customers.

## COUNT I
### Violations of Section 11 of the Securities Act Against Defendants Freshpet, Thompson, Kassar, and Norris

58. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against defendants Freshpet, Thompson, Kassar, and Norris.

60. The Registration Statement was defective and inaccurate, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

61. The defendants named herein were responsible for the contents and dissemination of the Registration Statement.

62. As issuer of the shares, defendant Freshpet is strictly liable to Lead Plaintiff and the Class for any misstatements and omissions.

63. The defendants named herein each caused the issuance of the Registration Statement and/or signed the Registration Statement, either personally or through an Attorney-in-Fact. The defendants named herein each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statement. They had a duty to ensure that such statements were true and accurate and that there were no omissions of material facts that would make the statements misleading.

64. None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

65. In the exercise of reasonable care, the defendants named herein should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact necessary to make the statements made therein not misleading. As such, the defendants named herein are liable to Lead Plaintiff and the Class.

66. Lead Plaintiff purchased Freshpet shares in the Secondary Offering in reliance upon the defective Registration Statement and without knowledge of the untruths and/or omissions alleged herein and have been damaged thereby.

67. By reason of the conduct herein alleged, each defendant named herein violated Section 11 of the Securities Act.

**COUNT II**
**Violations of Section 12(a)(2) of the Securities Act**
**Against All Defendants**

68. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

69. This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Lead Plaintiff and the Class, against all Defendants.

70. Defendants were sellers and offerors and/or solicitors of purchasers of the securities offered pursuant to the Registration Statement. Defendants issued, caused to be issued and/or signed the Registration Statement in connection with the Offering. The Registration Statement contained a Prospectus that was used to induce investors, such as Lead Plaintiff and the other members of the Class, to purchase the stock offered by Freshpet.

71. As set forth above, the Registration Statement contained untrue statements of material fact, omitted to state other facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Defendants' actions of solicitation included preparing the defective and inaccurate Registration Statement and participating in efforts to market the Offering to investors.

72. Defendants owed to the purchasers of the common stock offered in the Secondary Offering, including Lead Plaintiff and the other Class members, the duty to make a reasonable and diligent investigation of the statements contained in the Registration Statement and to ensure that such statements were accurate and that they did not contain any misstatement or omission of material fact. Defendants, in the exercise of reasonable care, should have known that the Registration Statement contained misstatements and omissions of material fact.

73. Lead Plaintiff and the other members of the Class purchased or otherwise acquired common stock pursuant to the Registration Statement, and neither Lead Plaintiff nor the other Class members knew, or in the exercise of reasonable diligence could have known, of the untruths, inaccuracies and omissions contained in the Registration Statement.

74. By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act. Accordingly, Lead Plaintiff, individually and on behalf of the Class, hereby offers to tender to Defendants those securities that Lead Plaintiff and the other Class members continue to own, in return for the consideration paid for those shares together with interest thereon. Class members who have sold their shares are entitled to rescissory damages.

## COUNT III
## Violation of Section 15 of the Securities Act Against the Individual Defendants

75. Lead Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

76. This Count is brought pursuant to Section 15 of the Securities Act against the Individual Defendants.

77. Each of the Individual Defendants was a control person of Freshpet by virtue of his position as a director and/or senior officer of Freshpet. By reason of their senior management positions and/or directorships at the Company, as alleged above, these Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Freshpet to engage in the conduct complained of herein. In addition, the Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Freshpet. By

reason of such conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

78. Each of the Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and/or having otherwise participated in the process which allowed the Offering to be successfully completed.

## EXCHANGE ACT ALLEGATIONS

### Defendants' Fraudulent Scheme and Course of Conduct

79. Defendant Freshpet went public in November 2014 based on the proposition that it was uniquely positioned at the confluence of two growing trends in the United States: pet humanization, whereby people treat pets like part of their family, and consumer focus on natural, less-processed foods. When the Company reported its first results as a public company on December 10, 2014, Freshpet did not disappoint Wall Street's expectations, reporting revenue and earnings per share exactly in line with the Company's forecast. Analysts characterized Freshpet as a "dynamic growth story," in the early stages of a favorable growth cycle similar to the one playing out within the natural and organic food sector, and projected outsize revenue growth of 20%-30% over the next five to ten years.

80. However, very shortly after its IPO, and unbeknownst to investors, Freshpet's growth trajectory was veering off-course as numerous problems adversely affected its sales and Fridge growth.

81. Throughout the Class Period, Defendants knew that Freshpet suffered from manufacturing throughput constraints that negatively impacted the production of its top-selling shredded product. Freshpet was essentially using production equipment to manufacture shredded

product even though it was not designed to do so, which led to the equipment breaking down on a regular basis.

82. In addition, when Freshpet launched the shredded product, senior management did not think that Freshpet was going to have as much demand for the product as it ultimately did. So when the shredded product became the Company's number-one seller in many of its Fridges, Freshpet could not meet the demand. Although Freshpet was trying to increase its capacity, it could not keep up. Freshpet knew it was maxed out in its total production and needed to expand its production capabilities, but the expansion did not happen until 2016.[3]

83. Freshpet's projections for its all-important Fridge-growth metric were also undermined by problems with the Company's best customers. Freshpet prepared overly bullish projections that Defendants knew included unrealistic growth rates for Petco, PetSmart, and Target.

84. Faced with these undisclosed problems that threatened to end Freshpet's growth story, Freshpet's private-equity backers and senior executives rolled out plans in April 2015 to sell millions of shares of their personally held stock to the unsuspecting public five months after taking Freshpet public.

85. Further, by the summer of 2015 – and prior to the issuance of Freshpet's 2Q15 earnings results in August 2015 – Freshpet faced additional problems that further undermined its forecasts for Fridge growth. Great Atlantic & Pacific Tea Co. ("A&P") and Haggen Holdings,

---

[3] Freshpet needed to expand its brand-new manufacturing facility shortly after it was built. Specifically, in July 2015 – less than two years after opening a new $26 million, 60,000 square-foot factory in Bethlehem in November 2013 – Freshpet announced that it was adding 32,000 square feet to its building, thereby allowing it to double its production capacity by the middle of 2016. Indeed, in a November 12, 2015 filing with the SEC, Freshpet said it expected to invest $30 million to $32 million in its Freshpet Kitchens expansion project during 2015 and 2016.

LLC ("Haggen"), two of the Company's supermarket customers, were experiencing serious financial hardships that threatened the viability of the then-existent Freshpet Fridges located in their respective stores as well as any Fridge growth the Company had planned there. Specifically, in July 2015, A&P filed for bankruptcy protection and, the same month, Haggen's attempt to grow from 18 stores to 164 stores practically overnight teetered on the brink of failure (and ultimately resulted in Haggen's bankruptcy in September 2015). Freshpet's relationship with BJ's Wholesale Club ("BJ's") was also suffering at this time, resulting in removal of some Freshpet Fridges and decreased total revenue per BJ's. Nevertheless, Freshpet reiterated its overly bullish projections for Fridge growth.

86. In addition, by no later than June 2015, Freshpet's baked test product generated lower profit margins than originally expected due to higher cost per pound and a fire at the co-packing facility that produced the product, which shut down production for approximately two weeks.

87. Thus, rather than the image of an up-and-coming growth company that Defendants projected to Wall Street, in actuality, Freshpet had hit a wall because it could not produce its best-selling products to meet demand and its best customers were on the ropes and faced worsening challenges. Throughout the Class Period, Defendants made positive statements about Freshpet and its business but failed to disclose the material adverse facts detailed herein.

**1. Freshpet Suffered from Sales and Fridge Placement Problems at Some of Its Largest Customers**

88. During the Class Period, Freshpet was experiencing a host of issues with its largest customers which were then negatively impacting the Company's operations and were likely to continue doing so. Defendants were required to disclose these facts but did not.

**(a) Petco and PetSmart**

89. Throughout the Class Period, Freshpet's Fridge growth was stagnating in two of the Company's largest retail locations, Petco and PetSmart, and the Company was failing to meet its internal sales or Fridge placement expectations.

90. Throughout the Class Period, Petco and PetSmart were experiencing declining growth rates in the number of Freshpet Fridges they were willing to install in their stores and were experiencing declining sales of Freshpet products. Petco and PetSmart were experiencing intense competition from online sellers of pet food, which translated into declining numbers of consumers visiting their stores, and as a result, Freshpet was not growing its installed Fridge base as fast as expected in Petco and PetSmart. Moreover, as Petco and PetSmart faced increased online competition, they were grappling with whether to embrace Freshpet's model of premium, fresh pet food as opposed to focusing back on basic brands of pet food.

91. Petco's and PetSmart's troubles extended beyond Freshpet during the Class Period. Other brands in Petco and PetSmart were also struggling due to competition from online pet-food retailers, and Petco and PetSmart were looking for more investments from their manufacturers. Thus, at a time when Freshpet was looking to Petco and PetSmart to take on additional Fridges and sell more of the Company's products, Petco and PetSmart were, conversely, seeking greater investment from Freshpet.

92. Separately, during the Class Period, PetSmart harbored concerns about the shelf life of Freshpet's products, and PetSmart was unwilling to expand its line of Freshpet products by a significant amount because of its potential exposure to losses from expired products. Indeed, after PetSmart was acquired by private-equity firm BC Partners in March 2015, new

PetSmart management wanted to expand its Freshpet offerings but declined due to potential losses with expired products.

93. It was widely known in the pet-supply industry that Petco and PetSmart were stagnating financially, and Petco and PetSmart were key Freshpet customers. Accordingly, upon information and belief, Defendants knew of Petco's and PetSmart's struggles. Despite Freshpet's insight into their stagnation, however, Freshpet prepared overly bullish internal projections that Defendants knew included unrealistic sales growth rates for Petco and PetSmart.

**(b) Target**

94. At the start of the Class Period, Target, Freshpet's fourth-largest location for Freshpet Fridges, was undergoing a corporate reorganization and, therefore, was likely to postpone the installation of a significant number of Freshpet Fridges. In addition, in January 2015, Target's Canadian operations filed for bankruptcy protection and closed all 133 of its Canadian stores by April 2015, further diminishing Freshpet's prospects for Fridge growth.

95. On March 3, 2015, Target announced that it was embarking on a corporate reorganization that would eliminate several thousand positions over the next two years and result in cost savings of $2 billion over that time period. In a press release, Target explained that those savings would be realized through operations, technology and process improvements; supply chain and sourcing efficiencies; and corporate restructuring. Target said the restructuring would be concentrated at its headquarters locations and focus on driving leaner, more efficient capabilities, removing complexity, and allowing the organization to move with greater speed and agility. Target also said it would prioritize the Style, Baby, Kids, and Wellness merchandise categories. According to Target, other categories, including Grocery, were being repositioned to deliver a more compelling and appealing shopping experience. Target made no mention of

prioritizing the Pet category, which had previously been a key merchandising category. A week later, on March 10, 2015, Target terminated approximately 1,700 employees as part of the reorganization.

96. In addition, Target's doomed foray into Canada had a major impact on Freshpet. During 2013 and 2014, Target rapidly opened 133 stores in Canada (it previously had zero stores outside of the United States). However, Target's Canadian stores suffered a number of systemic problems, and on January 15, 2015, Target announced that it planned to discontinue all operations in Canada and that Target Canada had filed for bankruptcy. By April 2015, Target closed all 133 of its Canadian stores. Yet the Company had Fridges in many of Target's Canadian stores and had been forecasting growth there.

**(c) A&P and Haggen**

97. On July 20, 2015, A&P, the parent company of supermarket chains A&P, Pathmark, and Waldbaum's – filed for Chapter 11 bankruptcy protection. When A&P entered bankruptcy and sold its stores, there was neither a commitment as to whether the stores would retain Freshpet's Fridges nor whether the stores would continue to grow the number of Freshpet Fridges into new stores, which negatively impacted the total number of Freshpet Fridges. Freshpet was generally aware that there was a risk to Freshpet with the A&P stores because it was known that A&P had not been doing well for the previous five to ten years, but as soon as A&P filed for bankruptcy, *i.e.*, July 2015, senior Freshpet management knew the Company had to put A&P's Fridges at risk. Ultimately, A&P's bankruptcy did adversely impact Freshpet's forecasted Fridge growth: according to Defendant Morris, A&P was one of the grocery retailers referenced in Freshpet's November 11, 2015 press release whose bankruptcy impacted Freshpet's Fridge count by 100 stores.

98. The financial struggles of Haggen, another supermarket chain, also adversely impacted the Company's Fridge count. Indeed, Morris said the bankruptcy of Haggen, along with A&P, had impacted Freshpet's Fridge count and sales by approximately 100 locations. On September 8, 2015, Haggen filed for bankruptcy protection. However, Haggen's financial troubles were apparent to Freshpet by no later than July 2015.

99. Haggen's troubles began in March 2015, when it grew from 18 locations in Washington state and Oregon to 164 locations practically overnight, expanding into Southern California, Arizona, and Nevada. Haggen entered those three states in December 2014, when the parent company of the Albertsons supermarket chain sold 168 stores to satisfy federal regulators during its merger with the Safeway supermarket chain. Haggen bought 146 stores in the deal, paying an estimated $1.4 billion. By July 2015, Haggen's expansion struggles were widely publicized in the media, with news reports about hundreds of layoffs, reduced staffing hours, and even a $41 million lawsuit from Alberstons against Haggen over unpaid inventory.[4] Industry analysts said Haggen's failure had been expected by experts in the supermarket industry. They pointed to overpriced goods at Haggen stores, a problem that had plagued the stores since

---

[4] *See, e.g.*, Jonathan Horn, *Haggen Grocery Admits It's Struggling*, San Diego Tribune (July 14, 2015), http://www.sandiegouniontribune.com/business/economy/sdut-haggen-reduces-employee-hours-grocery-store-2015jul14-story.html; Brie Stimson, *Haggen Market Laying Off Hundreds of Employees*, NBC San Diego (July 24, 2015), http://www.nbcsandiego.com/news/local/Haggen-Market-Laying-Off-Hundreds-of-Employees-318452191.html; *Too Big, Too Fast? A Grocery Chain's Rapid and Rocky Rise*, Coupons in the News (July 27, 2015), http://couponsinthenews.com/2015/07/27/too-big-too-fast-a-grocery-chains-rapid-and-rocky-rise/; Angel Gonzalez, *Haggen's Expansion in Southwest Fraught with Legal Problems, Layoffs*, Seattle Times (July 27, 2015), http://www.seattletimes.com/business/retail/haggens-expansion-in-southwest-fraught-with-legal-problems-layoffs/; *see also* Hannah Madans and Nancy Luna, *Haggen Bankruptcy: Failure Is the 'Fastest' in Modern Grocery Store History*, O.C. Register (Sept. 9, 2015), http://www.ocregister.com/articles/haggen-681753-california-southern.html; Shan Li and Andrew Khouri, *Grocery Chain Haggen Is Leaving California, Nevada and Arizona*, L.A. Times (Sept. 24, 2015), http://www.latimes.com/business/la-fi-haggen-california-20150924-story.html.

Haggen opened. Industry experts also said Haggen failed to do its own market research, instead relying heavily on Albertsons and Safeway – their seller and rival – as a guide to how to price products.[5]

**(d) BJ's Wholesale Club**

100. Warehouse club retailer BJ's was another retailer that the Company felt bullish about getting into but did not. Freshpet had distribution in the club retailers and thought that it was going to keep it. However, Freshpet ended up having to take out some of its Fridges from BJ's, which impacted its total revenue per BJ's club. Freshpet knew in the summer of 2015 that it was having issues with BJ's. Those issues started in the beginning of 2015, when Freshpet realized its frozen products were performing poorly. At that time, the Company tried to discontinue selling its frozen products at BJ's. BJ's, however, did not agree, and kept fining the Company for not maintaining sufficient frozen products.

**2. Manufacturing and Production Problems with Shredded Dog Food Product**

101. Freshpet's new shredded dog food product was suffering from manufacturing and production problems that were significantly limiting sales of the product and causing relationship issues with some of the Company's largest customers, which were negatively impacting the Company's ability to grow business with those customers.

102. In 2014, Freshpet introduced its shredded dog food product. By the start of the Class Period, Freshpet's shredded dog food product was the best seller in many of its Fridges.

103. However, as the Class Period began, Freshpet was experiencing significant manufacturing throughput constraints with its shredded product. Throughput is the amount of

[5] In addition to the A&P and Haggen closures, in 2015, Kroger, the fifth-largest location for Freshpet Fridges, closed a few stores, which affected Freshpet's forecasted Fridge growth for 2015.

material or items passing through a system or process. A throughput constraint is where a manufacturer cannot meet demand because its throughput is smaller than expectations.

104. Freshpet's shredded dog food product required a different manufacturing process than that employed for the Company's other products, yet the Company was using production equipment that wasn't designed to manufacture shredded product. As a result, Freshpet was replacing manufacturing equipment at a faster rate than anticipated. For example, Freshpet experienced throughput constraints with its rotators, a machine that Freshpet forced to produce the shredded product even though it was not designed to do so. Because Freshpet had to figure out a number of other solutions in terms of how the shredded product actually went into the steam cooker, Freshpet did not achieve the level of throughput it expected.

105. Throughput constraints with respect to the shredded product existed in the beginning of 2015. Freshpet launched the product in July 2014 but could not meet the original timing of distribution to some of its customers. Freshpet improved its distribution by October 2014, and by 2015, Freshpet realized just how successful the shredded product was and the Company kept trying to retool the manufacturing of its existing line. In the past, Freshpet sufficient time to reengineer its processes and products because of the ample time in production. However, with the additional new products that Freshpet was producing, the Company's Bethlehem operations were stretched to maximum capacity. Freshpet had no additional time to devote to reengineering the product, and that was a major constraint to Freshpet's overall profitability. As a result, the machines making the shredded product were consistently breaking down from the beginning of 2015 through the rest of that year.

106. Upon information and belief, Freshpet's senior management was aware of these production problems. Specifically, in the beginning of 2015, a director of one of the Company's

business functions presented Defendants Kassar and Morris with production updates from the Bethlehem production facility reflecting these manufacturing problems. In addition, Defendant Thompson was frequently at the Bethlehem facility – approximately three times per week – because he lived in the Bethlehem area. Thus, upon information and belief, Thompson was also aware of the manufacturing problems occurring at the Bethlehem plant.

107. Freshpet's throughput problems created several material problems for the Company that were negatively impacting its continuing operations. First, as a result of the throughput issues, Freshpet was unable to produce enough product for its most important customers, resulting in significant distribution delays, and this inability was causing customer dissatisfaction and reduced sales. For example, during the Class Period, Freshpet was experiencing difficulty in keeping its Fridges stocked in Walmart, its largest retailer of Freshpet Fridges. It was Walmart's policy to fine companies that were unable to keep their products sufficiently stocked. In the first half of 2015, Freshpet had its Fridges in approximately thirty percent of Walmart's U.S. stores. Freshpet management had hoped to expand into more Walmart locations, but the fact that Freshpet was on the verge of being fined for not being able to keep its Fridges stocked significantly hurt its chances for growth at Walmart. Second, the throughput issues, which existed throughout the Class Period, negatively impacted Freshpet's gross profit margin for the third quarter of 2015. Specifically, on November 11, 2015, Freshpet disclosed that the manufacturing throughput problems for its shredded product resulted in a 91 basis-point impact on gross profit margin in 3Q15 and was a primary driver of the Company's lower-than-expected EBITDA guidance for the following quarter.

### 3. Freshpet's New Baked Product Led to Declining Gross Margins

108. During the Class Period, Freshpet announced that it was market-testing its new "baked" product, which differed from its refrigerated product because it was essentially dry pet food.[6] Testing of the baked product began in March 2015 at Target. Although dry pet food typically has good profit margins, because of how unique Freshpet was trying to produce the baked product, as well as the unique proposition of the product, these factors were negatively impacting the baked product's profit margins by no later than June 2015. Moreover, the co-packing[7] facility in Baxter Springs, Kansas that produced the baked product experienced a fire on July 6, 2015, causing production to cease for at least two weeks, further destabilizing Freshpet's overall profitability for the baked product. Freshpet needed to produce the maximum capacity of the baked product in order to achieve its forecasted profit margin but never did because of the slower build of the product and the fire and, as a result, Freshpet's cost per pound was much higher than what it should have been. Accordingly, the profit margin for the baked product was significantly lower than Freshpet's original expectations. The assumption of a greater demand for the baked product was, yet again, the result of senior management's overly bullish mentality.

---

6 According to the Company, Freshpet's baked dog food is different from traditional dry dog food because it is "the first dry dog food recipe made with 100% fresh poultry" instead of chicken meal, "and real, antioxidant-rich superfoods."

7 A contract packer, or co-packer, is a company that manufactures and packages foods or similar products for their clients. To market and distribute, a co-packer works under contract with the hiring company to manufacture food as though the products were manufactured directly by the hiring company.

**Materially False and Misleading Statements Made During the Class Period**

109. The statements referenced above in ¶¶51-53 from the Registration Statement and Prospectus are incorporated herein by reference.

110. The Class Period commences on April 1, 2015. On March 31, 2015, after the close of the market, Freshpet issued a press release announcing its financial results for the fourth quarter and year end of 2014, the period ending December 31, 2014. On the same day, the Company filed its annual financial report on Form 10-K with the SEC for the same period. For the year, Freshpet reported net sales of $86.8 million, gross margin of 48.7%, adjusted EBITDA of $5.5 million, and Freshpet Fridges of 13,386.

111. With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> Outlook
>
> For full year 2015 the Company expects:
>
> - Net sales of $112.0 to $114.5 million, an increase of 29% to 32%, compared to 2014.
> - Adjusted EBITDA of $16.0 to $17.5 million, an increase of $10.5 to $12.0 million compared to 2014.
> - Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%, compared to 2014.

112. After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the Company's earnings release and operations. Defendant Thompson discussed Freshpet's Fridge outlook for 2015, stating, in pertinent part, as follows:

> We own and maintain over 13,500 Freshpet fridges across North America and see significant whitespace for expansion.

> Dick will discuss our financial outlook for 2015 in more detail. But ***we continue to expect to install approximately 2,000 Freshpet fridges in new store locations each year. Long-term, we believe 35,000 store locations are achievable***. Within our existing retail partners alone, we have the opportunity to almost double our store count.

113. Defendant Kassar provided additional detail regarding the Company's outlook for the first quarter and full year, stating, in pertinent part, as follows:

> We expect quarter-one Freshpet fridges of approximately 14,000, representing an increase of approximately 19.9%, and quarter-one net sales growth of approximately 37% to $26.5 million compared to quarter-one of 2014. We expect adjusted EBITDA of approximately $2 million, an increase of approximately $1.2 million versus quarter-one of 2014.
>
> * * *
>
> ***For full-year 2015, we expect Freshpet fridges in the range of 15,100 to 15,600***, representing an increase of approximately 13% to 17% compared to the prior year. We project our net sales to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% versus 2014, and adjusted EBITDA to be in the range of $16 million to $17.5 million.

114. In response to questions regarding the growth of the Company's Freshpet Fridge locations, Defendants Morris and Thompson stated, in pertinent part, as follows:

> ANALYST: [L]ast question and I'll pass it on for others. We have the 1Q fridge number. As we think about the cadence of the build throughout the year, typically, it's a little bit lumpier in the second quarter. Would you expect a similar seasonal pattern this year?
>
> And then also on count, we didn't get the update on count by retail class or sales by channel. Is that something we should expect in the filings?
>
> SCOTT MORRIS: From a fridge standpoint, so we got off to a good start in the year, and we are looking for it to continue to develop at, I would say, a similar pace to how we saw the year develop last year. ***What we want to make sure we are doing is we are guiding to really what we know versus what we think. And you'll see that reflected in the fridge location guidance for the year, the [15.1 to 15.6] that we quoted***.
>
> * * *

> ANALYST: [A]s you look at kind of the cooler count for this year and the expansion, I imagine by now, you have pretty good visibility of where each cooler is going to go. I mean, can you give us some more color there in terms of mass versus grocery or higher velocity versus lower velocity? And also maybe any new customers you expect to see out of that mix next year?
>
> RICHARD THOMPSON: Yes, Bill. We've got -- we are very excited about where we are with our customers, and the momentum we have in all the areas, in new products, in sales, our velocity -- which, again, as I've said it before, but I'm very excited about the velocity, where we are headed here.
>
> ***The store count is obviously growing***. But the main focus is obviously velocity, velocity, velocity.
>
> But Scott, why don't you -- you can just talk about the stores, where they are going.
>
> SCOTT MORRIS: Yes, sure. So, I think, as we had anticipated the way it looks like it's going to come in this year, it will be heavier development in grocery and mass partners. ***In addition, as you guys are well aware, we do have visibility out several months, but we also don't exactly know what's going to develop over the next kind of 30, 60 and 90 days. And that's kind of why we gave a guidance where this is what we know versus what we think***.
>
> Now, over the 30 and 60, 90 days that we are going to kind of see, there could be some significant opportunities to come in, but we don't know those yet. And we didn't want to put in our -- out a number that we may be incorrect on.
>
> RICHARD THOMPSON: Yes. And I just want to be very clear, Bill -- ***we are very confident, highly confident of our numbers this year for especially the velocity and the sales that we have this year***. So, the store count is important for sure, but the velocity is -- and sales are what our top priority are.
>
> ***So we are very confident that we are going to be where we need to be by the end of the year***. And we've got some new retailers that we are not in right now that we are having serious discussions with, that we are very excited about, that unfortunately, until we are actually in, I don't want to be able to use their names. But we've got some new guys that we are not in right now that we are excited about getting into here shortly.

115. Defendant Thompson described the Company's EBITDA forecast for full-year 2015 as "conservative," stating, in pertinent part, as follows:

> [A]s leader of the group***, I just want to be sure that we are being conservative*** -- not ultraconservative, but we are being conservative, ***and that we do what we say***

> ***we're going to do***. And it's always nice at the end of the day to be able to [do] more than what you say you're going to do. ***But we like to put something out there that we know that this group, with the knowledge we have, can make it happen***.

116. In reaction to these announcements, over the next six trading days, the price of Freshpet common stock rose from $19.43 per share on March 31, 2015, to a Class Period high of $25.46 per share on April 9, 2015 – an increase of 31%.

117. The statements referenced above in ¶¶110-115 were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that the Company was then experiencing manufacturing and production problems that were affecting Freshpet's production of its shredded product;

(b) that the growth of Freshpet Fridges was stagnating in Petco and PetSmart, and the Company was not growing the number of Fridges in those retailers as fast as expected;

(c) that Target's bankruptcy filing for its Canadian operations was having, and would have, a material impact on Freshpet Fridge growth and dog food sales at those locations; and

(d) that Target was undergoing a corporate reorganization such that it was likely to postpone the installation of a significant number of Freshpet Fridges.

118. On April 13, 2015, Freshpet filed the Registration Statement to register the sale of 4,500,000 shares of its common stock. On April 27, 2015, the Company filed an amendment to the Registration Statement, in which it increased the amount of shares to be offered in the Secondary Offering to 5,313,351. On April 29, 2015, Freshpet issued a press release announcing the pricing of its public offering of 5,313,351 shares of its common stock at a public offering price of $21.47 per share. The Company completed the Secondary Offering on May 5, 2015.

119. The statements referenced in the Registration Statement in ¶¶51-53, 118 were materially false and misleading for the reasons set forth in ¶117 above.

120. On May 7, 2015, Freshpet issued a press release announcing its financial results for the first quarter of 2015, the period ending March 31, 2015. On May 11, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the same period. For the quarter, Freshpet reported net sales of $27.1 million, gross margin of 49.0%, adjusted EBITDA of $2.0 million, and Freshpet Fridges of 14,019.

121. With regard to the Company's outlook, the press release stated, in pertinent part, as follows:

> Outlook
>
> The Company reiterated its guidance for 2015. For full year 2015, excluding any potential incremental impact associated with the Freshpet Baked test product, the Company expects the following full year results compared to prior year:
>
> - Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.
> - Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.
> - Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%.

122. After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations. In response to questions concerning the Company's guidance of Freshpet Fridge store locations, Defendants Morris and Thompson, stated, in pertinent part, as follows:

> ANALYST: Okay. And then just to -- I wanted to check on -- there's a couple of major customers of yours that you thought might be dragging their feet a little bit in terms of getting new merchandising, and just being able to execute the way they normally execute. Any changes in that timing or anything like that? Or are they still in the throes of rethinking their broader strategies? And is that still kind of slowing things down, I guess?

> SCOTT MORRIS: I think the information that we can definitely share is that ***we do feel consistently good about the range in stores that -- the guidance that we gave on the last call, the 15,100 to 15,600, and Dick just reiterated it***. There are a handful of retailers that have had some challenging times this year. There always are. And we're waiting on a couple of reasonable sized opportunities that are pending for Q3, and I think that will -- depending on how those come through, it will put us at different places in the range.
>
> ANALYST: Right. Okay. So, a couple of months ago, I think that's what you said, so there's no new news on that front in terms of that?
>
> RICHARD THOMPSON: No, no. But I can assure you, Rob, we keep working hard every day. And every day, we make more and more contacts, and everybody loves what we're doing.
>
> * * *
>
> ANALYST: That's great to hear. Well, we'll stay tuned. Just one additional one. Could you speak to what you're seeing as far as velocity gains across your footprints? Any additional color by channel where you are seeing the strongest growth?
>
> SCOTT MORRIS: Typically where we see the most significant increases in velocity are the channels that are outperforming the category. ***So, you start at the top in pet specialty. We typically get a little bit better performance; our stronger same-store sales growth***. Right under that you have mass, and then grocery. And that's a very -- if you look at the growth rates across those channels, it's pretty similar. ***What I mean by that is if you look at the growth rates in pet, those are going to be the highest***; mass is going to be second; and grocery is going to be slightly lower.
>
> ***So, outperforming in pet*** and mass; and mass and then grocery is kind of the last on the list. And Whole Foods and natural is a clear outlier for us. We are seeing terrific numbers coming from them.

123. The statements referenced in ¶¶120-122 were materially false and misleading for the reasons set forth in ¶117 above.

124. On August 11, 2015, Freshpet issued a press release announcing its financial results for the second quarter of 2015, the period ending June 30, 2015. On August 13, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the same period. For the quarter, Freshpet reported net sales of $28.4 million, adjusted EBITDA of $2.8 million, and

Freshpet Fridges of 14,354. Freshpet reported a net loss per share of $0.07, which was worse than analysts' consensus expectation of a loss of $0.05 per share.

125. The Company's reported number of 14,354 Freshpet Fridges represented an increase of 14% from 12,593 during 2Q14. However, it also represented a slowing rate of Fridge growth, as compared to Fridge growth of 21% in 1Q15 and 23.5% in 4Q14. Nevertheless, Freshpet maintained its guidance for full-year 2015 Fridge growth. With regard to the Company's 2015 outlook, the press release stated, in pertinent part, as follows:

> The Company reiterated its guidance for 2015. For full year 2015, excluding any potential incremental impact associated with the expanded test of the Company's Freshpet Baked product, the Company expects the following full year results compared to prior year:
>
> - Net sales of $112.0 to $114.5 million, an increase of 29% to 32%.
> - Adjusted EBITDA of $16.0 to $17.5 million an increase of $10.5 to $12.0.
> - Freshpet Fridges of approximately 15,100 to 15,600, an increase of approximately 13% to 17%.

126. After the earnings announcement, Freshpet held a conference call with analysts and investors to discuss the earnings release and the Company's operations. Defendant Thompson touted Freshpet's new baked product, stating, in pertinent part, as follows:

> ***We are also pleased with our initial test of Freshpet's new baked product***. Our fresh-baked food is the new exciting way that our innovation team has reinvented dry kibble. As we have said in the past, this innovative product uses all fresh meats, no rendered meals, and the final product is minimally processed with visible super foods inclusions.
>
> While fresh-baked is still in a test phase, given the positive early read from consumers and customers, we've decided to expand the test to a select group of retailers and support it with $3.5 million of incremental marketing spend in the third and fourth quarters of this year.

127. During the call, Defendant Morris also spoke positively about the dry/baked product test, stating: "obviously we would not have continued to expand the test and spread our wings a little but further with dry if we weren't happy with the initial results behind it."

128. Thompson also discussed the state of the Company's manufacturing infrastructure, stating, in pertinent part, as follows:

> [Regarding] manufacturing infrastructure: ***in order to keep up with demand and support our fantastic sales growth, we have enhanced our strategic manufacturing infrastructure capabilities at our Freshpet Kitchens in Bethlehem in two ways. First, we are upsizing much of the equipment in phase two to provide increased capacity*** that will exceed $400 million per year in revenues.
>
> Second, we took advantage of a unique opportunity to ***purchase a 60,000 square foot building on 6.5 acres directly adjacent to our current Freshpet Kitchens location in Bethlehem, Pennsylvania***. Dick will provide more details on our capital plan a bit later.

129. During the call, Defendant Kassar reiterated the Company's full-year 2015 outlook, stating, in pertinent part, as follows:

> ***For the full year 2015, I'll reiterate our previously disclosed guidance. We continue to expect Freshpet Fridges in the range of 15,100 to 15,600, representing an increase of approximately 13% to 17% compared to the prior year***. We project our net sales, excluding Freshpet Baked test product, to be in the range of $112 million to $114.5 million, representing an increase of 29% to 32% compared to 2014. And adjusted EBITDA, excluding Freshpet Baked test product, to be in the range of $16 million to $17.5 million, an increase of $10.5 million to $12 million compared to 2014.

130. Morris also discussed the Company's 2015 year-to-date performance, stating, in pertinent part, as follows:

> ANALYST: [I] think you describe first quarter definitely ahead of your plan. Second quarter you said you were happy with the results. Is it fair to say that the first half of the year is ahead of plan as you originally had it. And is second quarter pretty much in line with what you thought it would be?
>
> SCOTT MORRIS: Yes, I think that's fair. We were marginally ahead in Q2. I think Q1 was a -- we were rolling in Q1 for sure.

131. In addition, Morris and Kassar discussed Freshpet's general performance in Petco and PetSmart, stating, in pertinent part, as follows:

> ANALYST: Wanted to get a sense of what the growth of the product is on the on track channel, the non food, drug and mass, Petco, PetSmart that sort of thing. . . . I was just try[ing] to figure what the growth was . . . for the Fresh product in the untracked channels in Petco, PetSmart that sort of thing.
>
> SCOTT MORRIS: [Y]ou'll see when you see the SKUs that is a year-over-year change second quarter was pet and natural channel was 20.3% in revenues. And then we had in the quarter we had $6.3 million -- $6.7 million in sales for the quarter, or up 20% year over year. And we're in all the Petcos, with PetSmarts basically 95% of them. So we're running at of $27 million, $28 million run rate.
>
> DICK KASSAR: So -- and the other thing to keep in mind there is that the -- I don't have an exact number, but there has been very little distribution growth because we were in the vast majority of the PetSmarts and Petcos. Literally a couple stores across PetSmart and Petco. So that's basically -- it almost the same-store sales, not far off from the same-store sales number.

132. On the same date, Freshpet disclosed that its gross margin gains throughout the rest of 2015 were likely to be more modest than contemplated and were forecasted to come in 100 to 200 basis points ("bps") below prior forecast exiting the year. In addition, the Company pointed to the lower end of its forecasted Fridge growth of 15,100 to 15,600 due to sluggish execution by customers. As a result, securities analysts at Canaccord Genuity lowered their earnings per share ("EPS") forecast for Freshpet from a loss of $0.03 to a loss of $0.13. Similarly, analysts at Credit Suisse noted that Freshpet's gross margin of 48.2% was well below their estimate of 51.5%, and down 120 bps from the prior year because of production inefficiencies related to the new baked product line. Analysts at Oppenheimer described Freshpet's 2Q15 results as mixed, as "weaker gross margins, slowing fridge growth, and only a reiteration of guidance likely disappoints."

133. In response to this news, on August 12, 2015, the price of Freshpet common stock declined $0.87 per share, or 6%, to close at $13.73 per share, on heavy trading volume of

approximately 1.9 million shares. Defendants, however, continued to conceal the full scope of the problems impacting Freshpet's business and operations.

134. The statements referenced above in ¶¶124-132 were materially false and misleading for the reasons stated above in ¶117. In addition, the statements referenced above in ¶¶124-132 were materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a) that A&P and Haggen were experiencing serious financial hardships such that it was likely that any Freshpet Fridges located in their respective stores would soon have to be removed;

(b) that the Company's baked test product generated lower profit margins than originally expected due to higher cost per pound and a fire at the co-packing facility that produced the product; and

(c) that the Company's relationship with BJ's was strained, resulting in removal of some Freshpet Fridges and decreased total revenue per BJ's club.

135. After the market closed on November 11, 2015, Freshpet issued a press release announcing its financial results for the third quarter of 2015, the period ending September 30, 2015. On November 12, 2015, the Company filed its quarterly report on Form 10-Q with the SEC for the same period. For the quarter, Freshpet reported net sales of $30.6 million, adjusted EBITDA of $2.3 million, and Freshpet Fridges of 14,670. Freshpet reported gross profit margin of 45.9%, as compared to 48.3% for the same quarter the year before. The Company stated that the "decrease in gross profit margin was due to lower margin contribution from the Company's Freshpet Baked test product, which reduced third quarter 2015 gross margin by approximately

100 basis points. In addition, manufacturing throughput constraints associated with new product innovation and start-up costs from the implementation of new manufacturing processes further reduced gross margin by approximately 140 basis points." Defendant Thompson, commenting on the results, stated, in pertinent part, as follows:

> In the third quarter, net sales increased 36%, driven by increased velocity per fridge, demonstrating continued consumer demand for Freshpet's simple, natural pet foods. We made meaningful progress across several areas of our business, however, ***we experienced lower than expected Freshpet Fridge growth and our gross margin was negatively affected by manufacturing inefficiencies from new product innovation and the near term cost of adjusting processes on our primary products***. As a result, we have updated our annual guidance to reflect these headwinds, and are intently focused on the execution of our operational and financial objectives. Going forward, we will further improve our manufacturing costs and processes, drive greater leverage across our business model and in turn, enhance long-term shareholder value.

136. With regard to the Company's outlook, Defendants revised downward their guidance for net sales, adjusted EBITDA and Freshpet Fridges. In that regard, the Company's outlook was revised as follows:

| | **Initial Guidance** | **Revised Guidance** |
|---|---|---|
| **Net sales** | $117.0 to $119.5 million | $115.5 million to $117.0 million |
| **Adjusted EBITDA** | $12.5 to $14.0 million | $10.0 million to $11.0 million |
| **Freshpet Fridges** | 15,100 to 15,600 | 14,900 to 15,000 |

137. The same day, after the earnings announcement, the Company held a conference call with analysts and investors. Discussing the Company's disappointing third quarter results and lowered guidance for the year, Defendant Thompson, stated, in pertinent part, as follows:

> The third quarter sales increased approximately 36% to $30.6 million, driven by increased velocity growth per fridge. Our sales growth continued to outpace the distribution growth of Freshpet Fridges which increased 13% year-over-year to 14,670 locations. As we previously communicated, we expect that our 2015 Freshpet Fridge location growth to be closer to the low-end of our full year guidance of 15,100 to 15,600.

As we have gained more visibility, we now anticipate to end the year with approximately 15,000 Freshpet Fridges. ***We believe that the difference from our original guidance range to where we expect to end the year will be approximately $2.4 million in lost sales. The recent bankruptcy of two grocery retailers has also impacted our fridge count and sales by approximately 100 locations***.

While we are of course disappointed that we must temper our expectations for bridge [*sic*] growth near-term, this does not deter our confidence in Freshpet long-term growth opportunities. Time and time again we have seen the addition of a Freshpet Fridge grow the overall pet category attract new consumers, increase shopping frequency and provide category leading retail margins. This continues to be a strong value proposition for retailers and we still believe on average and over the next several years, the approximate 2,000 fridges on an annualized basis is achievable long-term.

As those familiar with our Company know, our Freshpet Fridge allows us to control critical real estate while truly differentiating our product at the point-of-purchase. As we own and maintain them, our Freshpet Fridges are key barriers to entry. This provides us with a unique Freshpet brand ambassador in every location.

The introduction of innovative new products in a diverse portfolio are important to driving sales growth and increased velocity. Our innovation team and our developments this year have been tremendous, and we are very pleased with the consumer response to our new products.

***However, production capabilities including the production throughput of our new Freshpet Shredded product has been lower than originally projected, and this limited our anticipated growth contribution and our gross profit margin was negatively impacted in the quarter by approximately 90 basis points***. I am pleased to say that our throughput rates improved a bit in October and early November, and we expect continued flow-through improvements once we begin to see the efficiencies from our upcoming manufacturing plant expansion, with a target completion date of second quarter 2016.

Earlier this year we communicated our action to increase price on certain Freshpet beef products to help us better absorb the drastic increase in beef commodity cost. As a result, we have experienced some softening in demand of those products.

Those products represent approximately 20% of our business and we experienced a 15% reduction or about a $900,000 in sales for Q3, and a $1.5 million for the year-to-date periods. We have since seen this trend level off with volume currently trending flat to up.

138. With regard to the Company's gross margins and revised guidance, Defendant Kassar stated, in pertinent part, as follows:

> Gross profit for the quarter was [$14.0 million], compared to $10.9 million during the same period last year (company corrected after the call). ***Gross profit margin was 45.9% for the third quarter of 201[5], compared to [48.3%] in the third quarter last year*** (company corrected after the call). The following items impacted our gross margin performance in the quarter.
>
> ***As Richard mentioned, our Freshpet Baked product currently has a gross margin of approximately 30%. While we do expect this will improve to approximately 35% by the end of the year, this lowered our margin in quarter three by 103 basis points.***
>
> ***In addition, our Freshpet Shredded throughput out of our manufacturing facility, has been lower than our outlook originally projected it, and this resulted in 91 basis point drag to gross margin in the quarter***. Finally, we also incurred a charge of $150,000 or 49 basis points from the implementation of new manufacturing processes in the quarter as we continuously look for efficiencies to improve our Freshpet roll production. In sum, these three items negatively impact our gross margin performance in the quarter by approximately 243 basis points.
>
> * * *
>
> ***For the full-year 2015 we are updating our previous guidance. We now expect Freshpet Fridges in the range of 14,900 to 15,000, representing an increase of approximately 11.3% to [12.1%] compared to the prior year (company corrected after the call). As a result, net sales are to be in the range of $115.5 million to $117 million representing an increase of 33% to 35% compared to 2014. Our net sales guidance includes approximately $5 million from the Fresh Baked test product.***
>
> ***Adjusted EBITDA is expected to be in the range of $10 million to $11 million, an increase of $4.5 million to $5.5 million compared to 2015. Including the negative contribution of $3.8 million from the Freshpet Baked product***. As a reminder, our adjusted EBITDA represents EBITDA plus loss on disposaled equipment, new plant startup expenses, share-based compensation, launch expense and secondary costs, and warrant expense.

139. During the November 11 conference call, Defendant Morris explained that a "fall off" of key anchor tenants and the bankruptcies of supermarket chains Haggen and A&P

contributed to Freshpet missing its Fridge-growth guidance. Morris stated, in pertinent part, as follows:

> We had, as we've discussed in I think earlier on in the year, we've had a handful of key anchor tenants fall off this year that we anticipated having come into the mix. And that's caused us to be on the lower end of the range. ***And then the last couple weeks we actually had a more recent surprise of around 100 stores between Haagen's [sic] and A&P***. So the – I'd say many things did not materialize or develop as positively as we would've hoped this year.
>
> * * *
>
> [W]e really had two significant surprises this year and now more recently, a third which is minor but it's still 100 stores doesn't help. But ***we had basically what we call anchor tenants. We had two people that had made commit -- one of them we had actually bought refrigerators for and based on some internal challenges at that retailer, they had actually decided to originally delay and then finally, basically postpone until the future, that the expansion of those fridges***.
>
> So unfortunately, sometimes all the cards don't necessarily fall your way. ***In the past, we've been lucky. We've had other people waiting in the wings and it's filled the bucket a different way***.

140. According to SunTrust Robinson Humphrey analyst William Chappell, Target was the anchor tenant that postponed new Fridge locations.

141. Also during the conference call, Kassar discussed production issues with the Company's shredded product, stating, in pertinent part, as follows:

> You know right now, our Shredded product is our fifth-largest SKU and we are certainly excited about that. ***In the third quarter, our production rates were significantly lower than we had ever projected***. We did mention this at least individually, if not on the call. . . .
>
> As Scott indicated, ***we've held back on further distribution of this product because of capacity issues***.

142. Morris elaborated on the production problems the Company faced with the shredded product, describing shredded as "one of our most significant challenges." Morris stated, in pertinent part, as follows:

> ***Actually on the Shredded, that has been one of our most significant challenges***.
> . . .
>
> ***From a manufacturing or production standpoint, it's been something that has ramped slowly***. While we have had some capacity issues with, we have actually decided to delay several pieces of plans or pieces of a plan to continue to roll that out. And ***part of it is not only production but part of it is because the production is slower on that, that it's causing us to have margin issues***.

143. During the call, Morris also explained how Petco and PetSmart were "slowing at a national level," stating, in pertinent part, as follows:

> ANALYST: Thanks. Good afternoon, everybody. I guess I'm curious, could you give us a bit of an update on what's going on at the non-tracked retailers?
>
> ***Scanner data showed slowing but it looks like the growth in the other channels, Petco, PetSmart, et cetera, seems worse***. And then the implication for Q4 guidance, if you extrapolate current scanner trends, would also indicate that that business materially worsens. So if you could give some update there, that would be helpful.
>
> SCOTT MORRIS: We have seen and I think everyone has expressed this in the pecking area, ***there has been a little bit of a softening in some of the pet retailers this year in the pet specialty space***. I think part of it is the -- there are other retailers that are sharpening their pens a little bit and they've gotten smarter and better at what they're doing. And I think there are a lot of new players in that mix that are in this smaller to mid tier that are getting better at what their – getting better at operating these smaller pet stores.
>
> But I think ***we have seen a little bit of a slowing at a national level for them and I think that some of our trends have followed that***. But the pricing action that we put in place, there are a handful of SKUs that were significantly impacted there. And that's something again, that we're taking a hard look at, reviewing and figuring out and reviewing the entire model and the products and the mix of products that we're going to be really focusing on in the pet specialty class of trade.

144. Following Defendants' corrective disclosures, securities analysts digested the new information. For example, on November 12, 2015, Credit Suisse analyst Robert Moskow downgraded Freshpet stock to Neutral and lowered Credit Suisse's target price to $9 per share from $19 per share. (Securities analysts at Stifel Nicolaus also slashed their price target to $9

from $18.) Moskow noted that Freshpet's "gross margin and EBITDA missed badly. Management also reduced its forecast for 4Q, which implies a weaker 2016 than we expected. New store locations fell below expectations . . . The shredded 'dry' test achieved its revenue target, but it caused significant manufacturing inefficiencies and dilution to the gross margin." Moskow noted that Freshpet's "gross margin of 45.9% was well below our estimate of 49.3%. Adjusted 3Q EBITDA of $2.3M fell well below our estimate of $4.3M. The revenue guidance for 4Q implies a significant slowdown in growth to 20% to 26%." Moskow explained that Freshpet's reduction of its end-year distribution forecast to 14,900-15,000 (down from the low end of the prior range of 15,100-15,600) "implies a net increase of 1,500 new stores in 2015, down from our original expectation of 2,350. The reduced outlook reflects the recent bankruptcy of two grocery retailers, which impacted Freshpet's fridge count by 100 stores." Regarding the baked test product, Moskow wrote: "Because of capacity constraints, management could not get the new product in all the stores they wanted to." Finally, Moskow explained that Freshpet's gross margin in 3Q15 was hurt by three main factors: (1) the baked test product had a lower margin that the rest of the business, leading to a drag of 103 bps; (2) throughput on the shredded product was lower than internal expectations, leading to a 91 bps hit to the margin in the quarter; and (3) Freshpet incurred a charge of $150,000 (49 bps impact to the margin) for the implementation of new manufacturing processing to increase the efficiency of the Freshpet roll item production.

145. SunTrust Robinson Humphrey analyst William Chappell expressed "surprise[] by the slowdown in the business implied by the 4Q15 guidance." He noted that Freshpet "[e]xperienced roughly $2.4M in lost sales due to store closures from the bankruptcy of two grocers and the ***postponement of new Fridge locations at Target***" and "[g]ross margin declined

240bps YoY to 45.9%, below our 47.5% estimate, driven by contribution from its lower-margin Baked product (30% gross margin; 100bps hit) and near-term manufacturing throughput constraints for its Freshpet Shreds product (140bps hit)." Chappell was troubled by Freshpet's revised full-year 2015 sales guidance, stating, in pertinent part, as follows:

> The [C]ompany revised its full year sales guidance from $117M-$119.5M (+35%-38%) to $115.5M-$117M (+32%-35%), which includes the contribution from Freshpet Baked which the company continues to expect to add $5M for the full year. Turning to the bottom line, ***FRPT now expects adjusted EBITDA to be in the range of $10M-$11M, 20% lower than the prior guidance of $12.5M-$14M***. The updated top-line guidance implies that the legacy refrigerated business will only post 10%-15% growth in 4Q vs. the 28% posted in 3Q. ***Recall, on the last conference call the company indicated that it would come in at the low end of its Fridge location goal (15,100-15,600) for the year due to order delays from one large customer. At that point management indicated that the lost/postponed new locations would not have a meaningful impact on full year sales due to their limited time in service. However, based on the updated guidance today, the postponed new Fridge locations, as well as the lost stores from the two grocer bankruptcies, will have a material impact on results and FRPT now expects Fridge locations in the range of 14,900-15,000***. Additionally, FRPT is still experiencing lower sales for its beef-flavored refrigerated products following the price increase implemented earlier this year. ***The combination of the diminished full-year top-line outlook and the continued manufacturing throughput issues for its Freshpet Shredded product is the primary driver of the lowered EBITDA guidance*** . . . .

146. Tacitly acknowledging Defendants' overly bullish mentality, SunTrust's Chappell stated: "***Unfortunately, the company's forecasting credibility has dissipated*** and we feel the need to set the bar as low as possible until it shows signs of stability."

147. Joe Edelstein, a Stephens Inc. analyst, wrote that Freshpet's "production issues led to an unexpected margin short fall." He noted how Freshpet's stock declined by double-digits in response to the Company's report of 3Q15 results that missed expectations. Confirming diminished demand for Freshpet Fridges from Petco and PetSmart because those pet specialty retailers were suffering, Edelstein also reported that "Freshpet indicated that sales in the large national pet specialty stores have softened as a channel." Wedbush Securities analyst Phil

Terpolilli similarly remarked that "[m]ajor pet specialty retailers faced pressure year-to-date, which FRPT believes could be driven by competing retailers increasing focus[.]"

148. On November 12, 2015, Comtex News Network provided an analysis of Freshpet's disclosures, stating, in pertinent part, as follows:

> So why is the stock down? There were a couple of negatives in the quarter. First, while its FreshPet Fridge count increased 13% YoY, that was a bit lower than expected. In fact, the company is lowering its year-end target to 14,900-15,000, down from prior guidance of 15,100-15,600. ***Those FreshPet Fridges are its life blood, so that is spooking investors a bit***. That likely played a role in why the company lowered its FY15 revenue guidance to $115.5-117.0 mln from $117.0-119.5 mln. It's not a huge reduction in guidance, but it's definitely a negative.
>
> The other negative in the quarter was gross margin being negatively affected by manufacturing inefficiencies. Specifically, gross margin declined to 45.9% from 48.3% in the same quarter last year. The decrease in gross margin was due to lower margin contribution from the company's FreshPet Baked test product, which reduced Q3 gross margin by approximately 100 basis points. In addition, manufacturing throughput constraints associated [with] new product innovation as well as start-up costs further reduced gross margin by approximately 140 basis points. This gross margin shortfall was likely the main culprit for the EPS miss.
>
> * * *
>
> On the negative side, there is some skepticism about the refrigerated model generally. Do pet owners want to spend this much on pet food? We all care about our pets, but it seems like an expensive option. Is it really that much different than canned food which is quite a bit cheaper? Also, do you really want pet food in your fridge next to your food? . . .

149. In reaction to these announcements, on November 12, 2015, the price of Freshpet common stock fell $2.09 per share, or 25%, to close at $6.28 per share, on extremely heavy trading volume of approximately 4.9 million shares, compared to average daily volume at the time of 530,100 shares.

150. The market for Freshpet common stock was open, well-developed and efficient at all relevant times. As a result of the materially false and misleading statements and omissions alleged herein, Freshpet common stock traded at artificially inflated prices during the Class

Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired Freshpet common stock relying upon the integrity of the market price of Freshpet common stock and market information relating to Freshpet, and have been damaged thereby.

151. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Freshpet common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business, and operations, as alleged herein.

152. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Freshpet's operations and future financial prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Freshpet common stock and its business, thus causing the Company's shares to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's shares at artificially inflated prices, thus causing the damages complained of herein.

**ADDITIONAL SCIENTER ALLEGATIONS**

153. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Freshpet, their control over, and/or receipt and/or modification of Freshpet's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Freshpet, participated in the fraudulent scheme alleged herein.

154. Defendants were further motivated to engage in a fraudulent course of conduct in order to allow certain Company insiders and others to collectively sell over 6.1 million shares of their personally held Freshpet common stock in the Secondary Offering for gross proceeds of over $131.1 million. The following chart reflects sales made by Freshpet's two Principal Stockholders and its executive officers and directors:

| Insider | Title | Number of Shares | Proceeds |
|---|---|---|---|
| Freshpet Investors LLC[8] | Beneficial Owner of More than 10% Class | 2,490,170 | $50,650,058 |
| MidOcean Associates SPC | Beneficial Owner of More than 10% Class | 1,750,000 | $35,595,000 |
| Morris (Scott James) | Officer | 52,255 | $1,062,867 |
| Thompson (Richard C.) | Chief Executive Officer | 50,808 | $1,033,435 |
| Kassar (Richard) | Chief Financial Officer | 30,300 | $616,302 |
| Walsh (Cathal) | Officer | 36,195 | $736,206 |
| Farina (Thomas J.) | Officer | 15,000 | $305,100 |
| Macchiaverna (Stephen) | Officer | 10,050 | $204,417 |

8 In May 2016, Freshpet Investors LLC disposed of all of its holdings of Freshpet common stock and subsequently dissolved.

| Insider | Title | Number of Shares | Proceeds |
|---|---|---|---|
| Hieger (Michael) | Officer | 1,118 | $22,740 |
| **Total:** | | **4,435,896** | **$90,226,125** |

**LOSS CAUSATION/ECONOMIC LOSS**

155. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Freshpet common stock and operated as a fraud or deceit on Class Period purchasers of Freshpet common stock by failing to disclose and misrepresenting the adverse facts detailed herein. As described in detail herein, when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Freshpet common stock declined significantly as the prior artificial inflation came out of the price of Freshpet stock.

156. As a result of their purchases of Freshpet common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' materially false and misleading statements had the intended effect and caused Freshpet common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $25.46 per share on April 9, 2015.

157. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Freshpet's manufacturing, operations, forecasts, and business prospects. When the truth about the Company was revealed to the market, the price of Freshpet common stock fell significantly. These declines removed the inflation from the price of Freshpet common stock, causing real economic loss to investors who had purchased Freshpet common stock during the Class Period.

158. The declines in the price of Freshpet common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Freshpet common stock negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

159. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Freshpet common stock and the subsequent significant decline in the value of Freshpet common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

**NO SAFE HARBOR**

160. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by an executive officer of Freshpet who knew that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

161. Lead Plaintiff is entitled to a presumption of reliance under the fraud-on-the market doctrine, because the market for Freshpet's publicly traded securities was open, well-developed and efficient at all times during the Class Period. As a result of the materially false and misleading statements alleged herein, Freshpet's common stock traded at artificially inflated prices during the Class Period. Further, Lead Plaintiff and other members of the Class purchased Freshpet's common stock in reliance on the integrity of the market price of the common stock and the market information relating to Freshpet, and were damaged thereby.

162. At all relevant times, the market for Freshpet common stock was an efficient market for the following reasons, among others:

(a) Freshpet common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b) as a regulated issuer, Freshpet filed periodic public reports with the SEC and the NASDAQ;

(c) Freshpet regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Freshpet was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers

of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

163. As a result of the foregoing, the market for Freshpet common stock promptly digested current information regarding Freshpet from all publicly available sources and reflected such information in the price of the common stock. Under these circumstances, all purchasers of Freshpet common stock during the Class Period suffered similar injury through their purchase of Freshpet common stock at artificially inflated prices and a presumption of reliance applies.

164. Lead Plaintiff is also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein are predicated in part upon omissions of material fact for which there was a duty to disclose. Specifically, Lead Plaintiff is entitled to a presumption of reliance throughout the Class Period because, as more fully alleged above, Defendants failed to disclose material information regarding the Company's manufacturing, operations, forecasts, and business prospects.

**COUNT IV**
**Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

165. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

168. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Freshpet common stock. Lead Plaintiff and the Class would not have purchased Freshpet common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

169. As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Freshpet common stock during the Class Period.

## COUNT V
## Violation of Section 20(a) of the Exchange Act Against the Individual Defendants

170. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

171. The Individual Defendants acted as controlling persons of Freshpet within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Freshpet, and their ownership of Freshpet stock, the Individual Defendants had the power and authority to cause Freshpet to engage in the wrongful conduct complained of herein.

172. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A. Determining, pursuant to Rule 23 of the Federal Rules of Civil Procedure, that this action may be maintained as a class action, and certifying Lead Plaintiff as a Class representative and Lead Plaintiff's counsel as Class counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other relief as the Court deems just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: March 27, 2017

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
*Liaison Counsel for Lead Plaintiff*

By: James E. Cecchi_____

JAMES E. CECCHI

Samuel H. Rudman
Alan I. Ellman
ROBBINS GELLER RUDMAN
& DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
(631) 367-7100

*Lead Counsel for Lead Plaintiff*

Frank J. Johnson
JOHNSON & WEAVER, LLP
600 West Broadway, Suite 1540
San Diego, CA 92101
(619) 230-0063

Michael I. Fistel, Jr.
JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, Georgia 30064
(770) 200-3104

*Additional Plaintiff's Counsel*